## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

**PARTY BOOK HILL PARK, LLC,**

Plaintiff,

v.

**TRAVELERS PROPERTY CASUALTY
COMPANY OF AMERICA**

Defendant.

Civil No. 18-1179 (GMM)

## REPORT AND RECOMMENDATION

This is an insurance coverage dispute that arouse after the LONE STAR barge (owned by Marine Environmental Remediation Group, LLC and/or its wholly owned subsidiary, MER Group Puerto Rico, LLC (collectively "MER")) sank. Travelers' Property Casualty Company of America ("Travelers") denied coverage. Party Book Hill Park, LLC ("Plaintiff") acquired the instant claim in MER's bankruptcy proceedings. Pending before the Court are Plaintiff's and Travelers' motions for summary judgment, oppositions, replies and sur-replies thereto. Docket Nos. 100, 116, 118, 120, 137, 139, 140 and 141. Travelers also filed a motion *in limine*, which is fully briefed. Docket Nos. 117, 119, 130, 132. After carefully examining the parties' filings, the corresponding statements of facts and the evidence submitted by both sides, the Court recommends that Travelers' motion *in limine* be **DENIED**, and that both motions for summary judgment be **DENIED**.

### I.    Factual and Procedural Background

On September 14, 2018, MER filed an amended complaint against Travelers seeking relief due to Travelers' denial of insurance coverage for the removal of the wreck of the LONE STAR. Docket No. 28. MER alleged that in 2016 Travelers sold MER a Protection and Indemnity ("P&I") Policy covering the period of September 17, 2016 to September 17, 2017. Docket No. 28 at ¶ 8. MER also alleged that Travelers sold to MER a Bumbershoot Policy covering the period of September 17, 2016 to September 17, 2017. Id. at ¶ 9 (the P&I and Bumbershoot Policies are hereinafter jointly referred to as the "Policies"). Both policies covered the barge LONE STAR,

1

which MER had purchased for recycling purposes. Id. at ¶ 11. The P&I Policy covered voluntary and compulsory wreck removal up to $1,000,000, and damages caused by third parties, including sabotage and vandalism. Id. at ¶ 15. The Bumbershoot Policy covered up to $9,000,000 of any amounts MER was obligated to pay for protection and indemnity risks and sue and labor; it was a policy that attached once the limits of the P&I Policy were exhausted. Id. at ¶¶ 16-20. MER alleged that it timely paid the premiums for both policies. Id. at ¶ 21. MER also alleged that Travelers issued various versions of the policies, which had errors in the terms and conditions that had been procured from Travelers. Id. at ¶¶ 22-29.

MER operated from Roosevelt Roads in Ceiba. Id. at ¶¶ 36-37. By October 2016, MER had reduced the LONE STAR to the "canoe" stage of recycling but was unable to conclude recycling because it did not have a parcel of land to store the canoes removed from the water. Id. at ¶¶ 38, 40. On April 30, 2017, MER was notified that the LONE STAR had sunk and that an oil slick was emanating from the LONE STAR. Id. at ¶¶ 46-47. MER's surveyors concluded that the cause of the sinking was that the valves on the vessel were opened. Id. at ¶¶ 49-50. MER alleged that its personnel did not open the valves. Id. at ¶ 51. MER alleged that it immediately notified Travelers of the sinking of the LONE STAR and requested coverage. Id. at ¶¶ 52-56. The U.S. Coast Guard issued an order requiring that the threat of pollution caused by the LONE STAR be removed. Id. at ¶ 57. As alleged, on June 30, 2017 (and again on August 11, 2017, and August 16, 2017), Travelers issued reservation of rights letters, which MER disputed. Id. at ¶¶ 58-60. Thereafter, the Puerto Rico Department of Natural and Environmental Resources issued an order requiring the removal of the wreck. Id. at ¶ 61. The Puerto Rico Local Redevelopment Agency also issued orders directing the removal of the LONE STAR. Id. at ¶¶ 63-64. Travelers was informed of the orders issued by the various government agencies but refused coverage on the basis that the claim was one for pollution rather than wreck removal. Id. at ¶¶ 60-64. Ultimately, MER retained Resolve Salvage & Fire (Americas) to remove the wreck. Id. at ¶ 65. MER seeks a declaratory judgment that Travelers is obligated to pay all costs incurred and paid in connection with the removal of the wreck. Id. at ¶¶ 71-73. MER also requests damages against Travelers for breach of contract. Id. at ¶¶ 74-80. And damages due to bad faith or *dolo* under Puerto Rico law. Id. at ¶¶ 81-89.

Travelers answered denying liability and asserted a counterclaim seeking a declaration that the Policies are null and void because MER breached its duty of good faith (*uberrimae fidei*)

(Docket No. 29 at ¶¶ 12-17), that MER is not entitled to coverage under the Policies due to its violation of the warranty of seaworthiness, because the vessel was not kept in a seaworthy condition, and because MER breached the terms and conditions of the Policies (Id. at ¶¶ 18-21, 26-31), that the sinking of the LONE STAR was not a fortuitous event (Id. at ¶¶ 22-25), and that the costs of raising the vessel were not covered under the Policies (Id. at ¶¶ 32-34). Alternatively, Travelers seeks that the limits of the Policies apply to any recovery obtained by Plaintiff. Id. at ¶¶ 35-36.

On December 17, 2018, Travelers filed a motion to stay proceedings pending resolution of a related case; Starr Indemnity & Liability Company v. Marine Environmental Remediation Group, LLC, Civil No. 17-9881 (S.D.N.Y.). Travelers argued that Starr provided coverage for pollution related to the LONE STAR, paid the costs of removing the LONE STAR, and subsequently sued MER for reimbursement, and that the outcome of the related case would directly impact this case. Docket No. 32. On February 8, 2019, the Court stayed proceedings and administratively closed this case. Docket Nos. 44 and 46. On June 14, 2022, Plaintiff filed a motion to reopen the case, and on June 16, 2022, the stay was lifted. Docket Nos. 49 and 58. All discovery concluded by November 16, 2022. Docket No. 113.

On October 17, 2022, Plaintiff filed a motion for partial summary judgment. Docket No. 100. Plaintiff seeks summary judgment against Travelers' counterclaim alleging (1) neither the Court's admiralty jurisdiction nor general maritime law apply because the LONE STAR was a "dead ship", (2) Travelers cannot establish the *uberrimae fidei* defense, (3) the LONE STAR was not a vessel and the doctrine of seaworthiness does not apply, and (4) the fortuity rule against coverage only applies in admiralty and, alternatively, Plaintiff has submitted sufficient evidence to establish fortuity. Id. at pp. 1-14. Plaintiff also seeks summary judgment in favor of its claims in the Amended Complaint alleging (1) the terms of the Policies are ambiguous and should be interpreted in its favor and against the exclusions claimed by Travelers, (2) Travelers breached the terms of the P&I Policy by failing to provide coverage for voluntary and compulsory wreck removal, (3) Travelers breached the terms of the Bumbershoot Policy by failing to provide excess coverage for compulsory wreck removal, and (4) the undisputed facts establish that Travelers failed to provide coverage in bad faith. Id. at pp. 11-25. Plaintiff's request for summary judgment is partial as it acknowledges that the damages are to be decided by a jury.

Travelers filed a motion *in limine* asking the Court to exclude from use in summary judgment and at trial all evidence offered by Plaintiff for which it refused to testify in its 30(b)(6) deposition. Docket No. 117. Specifically, and as will be discussed more fully below, Travelers seeks that the Court exclude all evidence related to nine (9) topics of deposition testimony notified to Plaintiff under Rule 30(b)(6) of the Federal Rules of Civil Procedure.

On November 30, 2022, Travelers filed a motion for summary judgment. Docket No. 120. Travelers seeks summary judgment on its counterclaim alleging (1) the costs of raising the LONE STAR were not covered under the Policies as the claim is one for pollution which was excluded under the P&I Policy, (2) the Policies are voidable under the doctrine of *uberrimae fidei*, (3) MER breached the terms of the Policies including the warranty of seaworthiness and by failing to keep the LONE STAR in a seaworthy condition, and (4) the sinking of the LONE STAR was not a fortuitous event and was thus not covered under the Policies. Id. at pp. 1-21. Travelers also seeks summary judgment asking for the dismissal of Plaintiff's claims alleging (1) the claimed event was not covered under the Policies and denial of coverage was justified, (2) Plaintiff cannot prevail on its claim of bad faith. Id. at pp. 21-24.

## II. Travelers' Motion *in Limine*

Travelers notified Plaintiff a deposition under Rule 30(b)(6) of the Federal Rules of Civil Procedure. Travelers attached a list of nine (9) deposition topics. Docket No. 117-6. Plaintiff produced Moiz Doriwala as its corporate representative. Doriwala refused to answer questions related to the topics notified by Travelers on account of the attorney-client privilege. Doriwala informed that his knowledge as to all the facts of the case was obtained through discussions with counsel. Docket No. 117-7. Travelers seeks to exclude all evidence related to the nine (9) topics of the deposition. Plaintiff opposed arguing that Travelers' is an untimely motion to compel discovery without complying with the requirements of the rules applicable to discovery disputes. The Court agrees with Plaintiff.

When a party wishes to depose a corporation, the corporation must designate a representative that consents to testify on its behalf. Fed.R.Civ.P. 30(b)(6). The designated person must testify about information known or reasonably available to the corporation. Id. A corporate representative is thus charged with the obligation of making good faith efforts to find out relevant facts by reviewing documents, interviewing employees with personal knowledge, and collecting additional information. Wilson v. Lackner, 228 F.R.D. 524, 528 (D.Md. 2005); See Santiago v.

Costco Wholesale Corp., 2020 WL 3669642 at *1 (D.P.R.) (corporate defendant is tasked with preparing corporate representative to testify as to deposition topics by reference to documents, information from past employees, and other sources of information even when such a preparation may be burdensome). "[A corporation] must make a conscientious good-faith endeavor to designate the persons having knowledge of the matters sought by [opposing party]" so that such persons can give answers that are binding to the party. Mitsui & Co. (U.S.A.), Inc. v. P.R. Water Res. Auth., 93 F.R.D. 62, 67 (D.P.R. 1981).

During his Rule 30(b)(6) deposition, Doriwala did not answer questions related to the nine (9) topics notified by Travelers, invoking instead the attorney-client privilege because he had no knowledge other than that which was conveyed by counsel. See Docket No. 117-7 at 19:05-20:20, 26:03-27:09, 30:02-31:14, 33:15-34:05, 34:06-18, 35:19-36:09, 36:10-22, 37:01-38:01, 40:06-41:07, 41:08-42:02, 42:03-43:10, 44:19-45:12, 46:09-47:02, 47:03-14, 48:12-21, 49:18-50:05, 51:03-16, 52:11-53:04. There is thus no question that Doriwala was not sufficiently and adequately prepared to address the topics notified by Travelers. That is, assuming that the communications sought by Travelers during deposition were covered by the attorney-client privilege, Plaintiff utterly failed to comply with its obligation under Rule 30(b)(6) by producing a witness that was unprepared to bind the corporation.

But Travelers' request at this juncture, after conclusion of discovery, is both untimely and procedurally improper. Despite its best efforts to dress the instant request as one of inadmissibility of the evidence subject to elimination for trial, the fact of the matter is that Travelers' complaint is one of discovery—Plaintiff's failure to produce a corporate representative in compliance with the requirements of Rule 30(b)(6) of the Federal Rules of Civil Procedure. A motion *in limine* is "[a] pretrial request that certain inadmissible evidence not be mentioned at trial." U.S. v. Agosto-Vega, 731 F.3d 62, 65 (1st Cir. 2013). The evidence Travelers seeks to eliminate— all documentary evidence and other testimonial evidence (not only that of Doriwala) related to the nine (9) topics identified in the Rule 30(b)(6) notice— is not in and of itself inadmissible. It would only be inadmissible if the Court were to sanction Plaintiff by preventing its presentation at trial. And Plaintiff has already informed that it will not be presenting the testimony of Doriwala during trial. Docket No. 132 at p. 5.

Pursuant to Rule 37(a)(1) of the Federal Rules of Civil Procedure, a party may move for an order compelling disclosure or discovery. Fed.R.Civ.P. 37(a)(1). "The motion must include a

certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery in an effort to obtain it without court action." <u>Id.</u>; <u>Brenford Envtl. Sys. L.P. v. Pipeliners of P.R.</u>, 269 F.R.D. 143, 147 (D.P.R. 2010). A party may move to compel discovery if a corporation or other entity fails to make a designation under Rule 30(b)(6). Fed.R.Civ.P. 37(a)(3)(B)(ii). This District Court's Local Rules require that any discovery motion must be accompanied by a certification of the moving party that it has made a reasonable and good faith effort to reach an agreement with opposing counsel on the matter in dispute. Local Rule 26(b); <u>Velázquez-Pérez v. Devs. Diversified Realty Corp.</u>, 272 F.R.D. 310, 312 (D.P.R. 2011) (<u>citing</u> <u>Aponte–Navedo v. Nalco Chem. Co.</u>, 268 F.R.D. 31, 40–41 (D.P.R.2010)). Absent such a certification, the Court will not entertain the matter.

There is no question that, for the Court to consider discovery disputes, these are to be presented in a timely fashion and after exhausting good faith efforts to reach an agreement. Travelers failed on both counts. The deposition at issue was scheduled for September 26, 2022, within the discovery deadline. Travelers waited until the conclusion of discovery and at summary judgment stage to move the Court for relief. The Court should not impose discovery sanctions when no effort to compel was made within the discovery deadline. <u>See</u> <u>Santiago v. Costco Wholesale Corp.</u>, 2020 WL 3669642 at *3 (D.P.R.) (the court cannot impose sanctions when no court order compelling the information at dispute was filed); <u>Owen v. No Parking Today, Inc.</u>, 280 F.R.D. 106, 112 (S.D.N.Y. 2011) ("a party must file a motion to compel before the close of a discovery and if it fails to do so, the motion will be deemed untimely"); <u>Lillie v. U.S.</u>, 40 F.3d, 1109 (10th Cir. 1994) (government could not be sanctioned under Rule 37 for failing to produce documents because plaintiff never obtained an order to compel discovery). Had Travelers sought relief during discovery, the Court could have ordered Plaintiff to produce an able witness and craft any other remedy necessary to avoid prejudice on Travelers. But by waiting until after the close of discovery, Travelers contributed to its own prejudice. At no point has Travelers certified to have engaged in good faith efforts to address the dispute with opposing counsel prior to seeking the Court's intervention. Indeed, Travelers has not even explained why the instant request could not be filed within the discovery deadline and after exhausting good faith efforts to confer. Under such circumstances, Travelers' request for elimination of evidence as a sanction against Plaintiff for not complying with Rule 30(b)(6) should be **DENIED**.

### III.    Summary Judgment Standard

Summary judgment under Rule 56 of the Federal Rules of Civil Procedure is warranted when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A dispute is considered genuine if "a reasonable jury, drawing favorable inferences [for the nonmovant], could resolve it in favor of the nonmoving party." Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 270 (1st Cir. 2014) (citation omitted). A fact is "material" if it could affect the outcome of the suit. American Steel Erectors, Inc. v. Local Union No. 7, 536 F.3d 68, 75 (1st Cir. 2008). "Conclusory allegations, improbable inferences, and unsupported speculation are insufficient to establish a genuine dispute of fact." Velázquez-Pérez, 753 F.3d at 270 (citations omitted).

A party moving for summary judgment bears the burden of proving that there are no genuine issues of material fact and that judgment as a matter of law is warranted. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). The moving party "may affirmatively produce evidence that negates an essential element of the non-moving party's claim" or "point to evidentiary materials already on file […] that demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial." Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000). "[I]f the summary judgment record satisfactorily demonstrates that the plaintiff's case is, and may be expected to remain, deficient in vital evidentiary support, this may suffice to show that the movant has met its initial burden." Carmona, 215 F.3d at 133; Ocasio-Hernández v. Fortuño-Burset, 777 F.3d 1, 4–5 (1st Cir. 2015). In evaluating a motion for summary judgment, the court must view "the record in the light most favorable to the nonmovant' and must make all reasonable inferences in that party's favor.'" Espacio Residential, LLC v. Gómez-Sánchez, 2023 WL 3548974 at 2 (D.P.R.) (quoting García-García v. Costco Wholesale Corp., 878 F3d 411, 417 (1st Cir. 2017)).

### IV.    Uncontested Facts

After examining the parties' submissions, but having disregarded any legal arguments and conclusory statements in the parties' statements of facts,[1] the Court finds that the following material facts are not in dispute:

1.    MER was the owner of the former pipe barge LONE STAR. Docket Nos. 116-1 ¶ 1; 118-1 ¶ 1. See Docket Nos. 100-4; 100-6; 100-7.

---

[1]    See Cotto-Vázquez v. United States, 2021 WL 965825 at 28 n.7 (D.P.R.) (quoting Cruz-Acevedo v. Toledo-Dávila, 660 F. Supp. 2d 205, 209 (D.P.R. 2009) ("[a]s a general principle, parties may not include legal arguments or conclusions in their statement of facts.")).

2.    MER purchased the LONE STAR for the sole purpose of scrapping and recycling it. Docket Nos. 116-1 ¶ 2; 118-1 ¶ 2. <u>See</u> Docket Nos. 100-3 ¶ 59; 100-4 at 3.

3.    MER conducted its ship scrapping operation at the former navy base at Roosevelt Roads in Ceiba (the "Facility"). Docket Nos. 116-1 ¶ 3; 118-1 ¶ 3. <u>See</u> Docket Nos. 100-3 ¶¶ 34–39; 100-5 at 3.

4.    On December 15, 2015, MER leased the Facility from the Local Redevelopment Authority for Roosevelt Roads ("LRA"). Docket Nos. 116-1 ¶ 4; 118-1 ¶ 4. <u>See</u> Docket No. 100-5.

5.    MER began dismantling the LONE STAR on or about December 15, 2015. Docket Nos. 140-1 ¶ 1; 141-1 ¶ 1.

6.    MER contracted with Travelers a Protection and Indemnity Policy of Insurance ("P&I Policy") and a Bumbershoot Policy of Insurance ("Bumbershoot Policy") to insure the LONE STAR barge. Docket Nos. 118-1 ¶ 24, 116-1 ¶ 24. <u>See</u> Docket Nos. 100-40 (P&I Policy of Insurance); 100-39 (Bumbershoot Policy Declarations); 100-41; 100-6 (P&I Binder); 100-7 (Bumbershoot Policy Binder); 100-11; 100-41; 100-46 ¶ 3-4.

7.    MER estimated that it would take approximately six months to reduce a vessel to its "canoe" stage. Docket Nos. 140-1 ¶ 2; 141-1 ¶ 2. <u>See</u> Docket No. 120-1 at 1, Kahn's Dep. 138:08-139:09 (Sept. 12, 2022).

8.    On July 29, 2016, MER represented to Arthur J. Gallagher Risk Management Services, Inc. ("AJG"), MER's insurance broker and its agent in dealing with Travelers, that the recycling of the LONE STAR had not yet begun. Docket Nos. 116-1 ¶ 33; 118-1 ¶ 33. <u>See</u> Docket No. 120-1 at 75 ("We currently own two vessels that are slated for demolition: a) LONE STAR […]").

9.    On July 29, 2016, AJG provided Travelers the Marine Insurance Submission Packet. Docket No. 140-1 ¶ 5; Docket No. 141-1 ¶ 5. <u>See</u> Docket No. 120-1 at 132.

10.   At the time MER applied for insurance with Travelers, MER knew that it did not have formal approval for a suitable parcel of land where to store canoes after removal from the water, but the Government of Puerto Rico had assured MER that one would be provided. Docket Nos. 140-1 ¶ 28; 141-1 ¶ 28. <u>See</u> Docket No. 120-1 at 1, Ex. 1, Kahn's Dep. 135:20-136:07; 100-3 ¶¶ 35-36.

11.   On July 29, 2016, MER represented to Travelers that the "[v]essel is to be broken up at MER's facility" and that the "[v]essel is to be broken up for recycling." Docket Nos. 140-1 ¶ 10; 141-1 ¶ 10. <u>See</u> Docket No. 120-1 at 138-139.

12.   In its Initial Submission, MER represented to Travelers that "[o]nce the ship has been reduced to the lower hull area (still afloat and capable of being towed), the remaining section (referred to as the 'canoe') near the conclusion of the process is towed to either a

graving dock or dry dock, a marine railway, or a roller-slip, installed and blocked and the final cleaning and demolition is performed." Docket Nos. 140-1 ¶ 7; 141-1 ¶ 7. Docket No. 120-1 at 130.

13.    Under "Exposure Details" in its Initial Submission, MER stated that it "owns four vessels" and, in describing the LONE STAR, informed that "[t]his vessel is slated for demolition." Docket Nos. 140-1 ¶ 9; 141-1 ¶ 9. Docket No. 120-1 at 132.

14.    On August 11, 2016, AJG emailed Travelers updated hull values for the SEVEN POLARIS, LONE STAR, and ATLANTIC VII, 2016-2017 Gross Receipt Forecasts/Estimates, Loss Runs, an "[i]mproved/updated Submission document" ("Supplemental Submission"), and other miscellaneous information. Docket No. 140-1 ¶ 11; Docket No. 141-1 ¶ 11. See Docket No. 120-1 at 161.

15.    Under "Exposure Details" in the Supplemental Submission, MER changed the LONE STAR from being "slated for demolition" to "being demolished." Docket Nos. 140-1 ¶ 14; 141-1 ¶ 14. See Docket No. 120-1 at 165.

16.    In the Supplemental Submission, MER represented to Travelers that its method of vessel demolition would "maintain […] the ship's watertight integrity, trim, and stability." Docket Nos. 140-1 ¶ 15; 141-1 ¶ 15. See Docket No. 120-1 at 163.

17.    Under "Insurance Requirements" in the Supplemental Submission, MER represented to Travelers that "MER is seeking a marine insurance program to cover its operational risk exposures [. . .]" Docket Nos. 140-1 ¶ 16; 141-1 ¶ 16. See Docket No. 120-1 at 164.

18.    Under "Exposure Details" in the Supplemental Submission, MER represented that it "owns four vessels." Docket Nos. 140-1 ¶ 17; 141-1 ¶ 17. See Docket No. 120-1 at 164.

19.    During the underwriting process, Travelers was informed by AJG that when the LONE STAR and other vessels were reduced to their "canoe" stage, these would remain afloat and capable of being towed. Docket Nos. 140-1 ¶ 23; 141-1 ¶ 23. See Docket No. 120-1 at 130; Cushman's Dep. (Sept. 14, 2022) at 176 (30:01-30:15).

20.    During the underwriting process, MER advised Travelers that it expected to receive final approval of a suitable parcel of land in the near future before the canoes would need to be removed from the water. Docket Nos. 140-1 ¶ 20; 141-1 ¶ 20. Docket No. 120-1, p. 220-224.

21.    During the underwriting process, Travelers was informed by AJG that the LONE STAR and other vessels would be removed from the water upon being reduced to their "canoe" stage. Docket Nos. 140-1 ¶ 21; 141-1 ¶ 21. See Docket No. 120-1 at 4, Cushman's Dep. 53:17-20.

22.    Travelers and AJG had numerous conversations about the risk throughout the underwriting process. Docket Nos. 140-1 ¶ 18; 141-1 ¶ 18. See Docket No. 120-1 at 4, Cushman's Dep. 28:06-11, 45:09-46:21, 52:12-19, 54:03-10; Docket No. 120-1, Ex. 8.

23.    The Policies bound on or about September 17, 2016, and covered the period between September 17, 2016 and September 17, 2017. Docket Nos. 140-1 ¶ 32; 141-1 ¶ 32. See Docket Nos. 100-6; 100-07; 100-39 at 1; 100-40 at 1; 100-46 ¶¶ 3–4.

24.    MER paid all the premiums under the P&I Policy. Docket Nos. 116-1 ¶ 26; 118-1 ¶ 26. See Docket No. 100-46 ¶ 6.

25.    MER paid all the premiums under the Bumbershoot Policy. Docket Nos. 116-1 ¶ 27; 118-1 ¶ 27. See Docket No. 100-46 ¶ 7.

26.    On September 17, 2016, Travelers issued MER a P&I Binder which listed the LONE STAR on the schedule of vessels. See Docket No. 100-6 at 3.

27.    On September 17, 2016, Travelers issued MER a Bumbershoot Coverage Binder which established a $9,000,000 limit of liability and listed the LONE STAR with a vessel "Pollution Policy" with a limit of $4,610,100. See Docket Nos. 100-7; 100-39 at 24.

28.    The P&I Policy provided coverage for both compulsory and voluntary wreck removal. Docket Nos. 118-1 ¶¶ 28-29; 116-1 ¶¶ 28-29.

29.    The Bumbershoot Policy provided excess coverage for compulsory wreck removal and pollution. Docket Nos. 118-1 ¶ 100; 116-1 ¶ 100. See Docket No. 100-38, Milana's Dep., 215:4–13.

30.    The Bumbershoot Policy did not provide coverage for voluntary wreck removal. Docket Nos. 118-1 ¶ 32; 116-1 ¶ 32. See Docket Nos. 100-7; 100-38, Milana's Dep., 215:4–13; 100-41.

31.    MER demolished the LONE STAR to the point where it felt that it was "as far as [it] can go safely" sometime between September and October 2016. Docket Nos. 140-1 ¶ 45; 141-1 ¶ 45. See Docket No. 120-1 ¶ 45, Kahn's Dep. 139:16-141:02.

32.    By November 2016, the LONE STAR had been scrapped to "canoe" form, i.e., only its lower hull remained. Docket Nos. 116-1 ¶ 14; 118-1 ¶ 14. See Docket Nos. 100-3 ¶ 59; 100-15 at 2.

33.    Travelers first issued a written copy of the P&I Policy (policy number ZOH-81M6730A-16-ND) on or about December 2, 2016. Docket Nos. 116-1 ¶ 37; 118-1 ¶ 37. See Docket No. 100-9 at 32 (the LONE STAR was covered under the policy limit of $1,000,000.00.)

34.    Travelers did not issue a written copy of the Bumbershoot Policy on December 2, 2016. Docket Nos. 116-1 ¶ 38; 118-1 ¶ 38.

35.    MER did not blank off the LONE STAR's sea chest valves. Docket Nos. 140-1 ¶ 56; 141-1 ¶ 56. <u>See</u> Docket No. 120-1, Fitzgerald's Dep. (Sept. 16, 2022) at 95:19-96:16 ("Q. What, if anything, was done to ensure that those valves were not opened again, either intentionally or accidentally? A. [n]othing that I could think of.").

36.    The LONE STAR sank on or about April 30, 2017. Docket Nos. 120-1 ¶ 62; 141-1 ¶ 62; Docket No. 100-15 at 1.

37.    When the LONE STAR sank, it discharged approximately 1,800 gallons of waste oil into the water. Docket Nos. 140-1 ¶ 69; 141-1 ¶ 69. <u>See</u> Docket No. 120-1, Fitzgerald Dep. 86:20-87:19.

38.    MER's insurance broker reported the loss of the LONE STAR to Travelers on May 3, 2017. Docket Nos. 116-1 ¶ 24; 118-1 ¶ 24. <u>See</u> Docket No. 100-13 at 1.

39.    On May 4, 2017, Travelers appointed a surveyor, Stewart Hutcheson, to investigate the loss of the LONE STAR. Docket Nos. 116-1 ¶ 39; 118-1 ¶ 39. <u>See</u> Docket No. 100-14.

40.    On May 8, 2017, Hutcheson went to Ceiba to survey the wreck of the LONE STAR. Docket Nos. 118-1 ¶ 40; 116-1 ¶ 40. <u>See</u> Docket No. 100-15 at 1; Docket No. 100-14.

41.    On May 9, 2017, Hutcheson provided a report which stated that "[t]he cause of the loss at this time cannot be determined." Docket Nos. 118-1 ¶ 41; 116-1 ¶ 41. <u>See</u> Docket No. 100-15 at 8.

42.    On June 30, 2017, Travelers issued its first Reservation of Rights letter. Docket Nos. 116-1 ¶ 53; 118-1 ¶ 53. <u>See</u> Docket No. 100-21; Docket No. 100-38, Milana's Dep. at 207:16-208:10.

43.    On July 7, 2017, the United States Coast Guard issued Administrative Order No. 007-17 ("First Administrative Order") which stated: "I have determined that there may be an imminent and substantial threat to the environment because of an actual and continued discharge of oil from the LONE STAR". Docket No. 100-18.

44.    The First Administrative Order stated that "[u]nder the Oil Pollution Act of 1990, the responsible party is liable for, among other things, removal costs and damages resulting from this condition. […] The Responsible Party, owners, operators or persons in charge of the Federal Water Pollution Control Act, to a civil penalty of up to $44,539 per day of violation or up to three (3) times the cost incurred by the Oil Spill Liability Trust Fund." Docket No. 100-18 at 3.

45.    The First Administrative Order stated: "I order you to remove from the water within a period of no more than 30 days the sunken vessel "Lone Star" which is currently located near the Pier 3." <u>See</u> Docket No. 120-1 at 477; Docket No. 140-1-1 ¶ 88.

46.     The First Administrative Order stated that the LONE STAR had discharged approximately 1,800 gallons of waste oil. Docket No. 100-18 at 1.

47.     On July 28, 2017, the Puerto Rico Department of Natural and Environmental Resources ordered that the LONE STAR be removed. Docket No. 140-1 ¶ 87; 141-1 ¶ 87.

48.     On August 11, 2017, Travelers issued a Second Reservation of Rights letter. Docket Nos. 116-1 ¶ 63; 118-1 ¶ 63. See Docket No. 100-29.

49.     On August 11, 2017, Travelers acknowledged that it had not yet provided correct written copies of the Policies that matched the intent and agreement of the parties. Docket Nos. 116-1 ¶ 67; 118-1 ¶ 67. See Docket No. 100-30 at 1, email from Zachary Cushman to Todd Hohlweck ("As discussed, intent for coverage is outlined by the binders that are attached. We are working on getting the policies to match the agreed intent").

50.     On August 14, 2017, the United States Coast Guard provided MER with an Amended Administrative Order Number 007-17, which required MER to conduct a dive assessment to identify and locate any oil still present within the LONE STAR and to have resources capable of removing the threat the LONE STAR posed to the local environment. Docket Nos. 116-1 ¶ 68; 118-1 ¶ 68. See Docket No. 100-31.

51.     On August 16, 2017, Travelers, issued a Third Reservation of Rights letter. Docket Nos. 116-1 ¶ 69; 118-1 ¶ 69. See Docket No. 100-32.

52.     On August 26, 2017, a dive team evaluated the sunken wreck of the LONE STAR. Docket No. 100-49.

53.     A dive performed on the wreck of the LONE STAR determined that the port main capable valve was open. Docket Nos. 116-1 ¶ 102; 118-1 ¶ 102. See the Dive Report at Docket No. 100-49 at p. 3, which states "[t]his indicates that the port side main sea chest valve was open. The diver also noted a large 4" line wrapped 3-4 times around the base of this valve, with a sling chocked on the valve base as well. The diver then continued to survey along the bulkhead at Frame 20. The diver noted multiple pipes and valves along this area that have been cut." Docket No. 100-49 at 3.

54.     On August 27, 2017, Travelers confirmed that it was still investigating coverage. Docket Nos. 116-1 ¶ 71; 118-1 ¶ 71. See Docket No. 100-34.

55.     On September 2, 2017, Hutcheson provided his second report. Docket Nos. 140-1 ¶ 81; 141-1 ¶ 81. See Docket No. 120-1 at 466-471.

56.     MER worked with Starr, its pollution insurer, to remove the wreck of the LONE STAR. Docket Nos. 116-1 ¶ 72; 118-1 ¶ 72. See Docket No. 100-35.

57.  On or about October 2017, Resolve began its salvage efforts, and by December 6, 2017, the wreck of the LONE STAR had been completely removed. Docket Nos. 116-1 ¶ 73; Docket No. 118-1 ¶ 73. See Docket No. 100-36 at 1.

58.  Starr paid Resolve $2,080,000.00 to remove the LONE STAR. Docket Nos. 140-1 ¶ 99; 141-1 ¶ 99. See Docket No. 120-1 at 507-510.

59.  Starr incurred and paid $2,485,358.97 in expenses on behalf of MER subject to a reservation of rights and preferred ship mortgage. Docket No. 100-45 at 11.

60.  The P&I Policy issued on July 3, 2018, includes a warranty for seaworthiness. Docket Nos. 140-1 ¶ 33; 141-1 ¶ 33. See Docket No. 120-1, Exhibit 10 at p. 255.

61.  The P&I Policy issued on July 3, 2018, includes a pollution exclusion clause. Docket No. 140-1 ¶ 34; Docket No. 141-1 ¶ 34. See Docket No. 100-40 at 31.

62.  The P&I Policy issued on July 3, 2018, established that the LONE STAR was included on the P&I Policy's Schedule of Vessels, providing $1,000,000.00 in Liability Coverage. Docket Nos. 140-1 ¶ 35; 141-1 ¶ 35.

63.  The P&I Policy provided one million dollars ($1,000,000.00) for voluntary wreck removal. Docket Nos. 118-1 ¶ 28; 116-1 ¶ 28. See Docket Nos. 100-3 ¶ 77; 100-6, 100-40 at 41; 100-41; 100-46 ¶ 12.

64.  The P&I Policy also provided coverage for compulsory wreck removal. Docket Nos. 118-1 ¶ 29; 116-1 ¶ 29. See Docket Nos. 100-38, 200:17–20; 100-40 at 34.

65.  The Bumbershoot Policy was issued on July 3, 2018 and provided $9,000,000.00 in excess coverage. Docket Nos. 140-1 ¶ 39; 141-1 ¶ 39; 100-3 ¶ 78; 100-7, 100-39 at 1; 100-46 ¶ 16.

66.  The Bumbershoot Policy issued on July 3, 2018, excluded voluntary wreck removal. Docket Nos. 140-1 ¶ 44; 141-1 ¶ 44. See Docket No. 100-39 at 37.

67.  The Bumbershoot Policy provided coverage for compulsory wreck removal. Docket Nos. 118-1 ¶ 32; 116-1 ¶ 32. See Docket Nos. 100-8; 100-11; 100-38, Milana's Dep. at 215:4–6; 100-41.

68.  The Bumbershoot Policy issued on July 3, 2018, includes a pollution liability form. Docket Nos. 140-1 ¶ 41; 141-1 ¶ 41. See Docket No. 100-39 at 26.

69.  The Bumbershoot Policy issued on July 3, 2018, listed Starr's Vessel Pollution Coverage on the schedule of underlying insurances with a limit of $4,610,100.00. Docket Nos. 140-1 ¶ 43; 141-1 ¶ 43. Docket No. 100-39 at 24.

13

70. Starr denied MER's claim related to the sinking of the LONE STAR and demanded a full reimbursement of the amounts paid by Starr. Docket No. 100-45 ¶ 13.

71. Starr and MER reached a settlement agreement in which MER's Bankruptcy Trustee paid Starr $793,500.00 of the $1,221,000.00 being held in escrow from the sale of the SEVEN POLARIS. Docket No. 100-45 ¶ 17.

72. On October 19, 2022, Hutcheson provided a final report which stated that "MER failed to exercise due diligence and failed to keep the LONE STAR in a seaworthy condition from November 2016 through April 30 2017." Docket No. 120-2 at 1.

73. Travelers denied compulsory wreck removal coverage stating that the wreck of the LONE STAR did not pose a threat to navigation and the orders to remove it were pollution centric. Docket Nos. 118-1 ¶ 94; 116-1 ¶ 94. See Docket No. 100-38 Milana's Dep. (Sept. 13, 2022) at 201:18–202:6.

74. Travelers denied voluntary wreck removal coverage on the basis that the sinking of the LONE STAR was a pollution event. Docket Nos. 118-1 ¶ 98; 116-1 ¶ 98. See Docket No. 100-38, Milana's Dep. at 214:4-9.

## V.    Discussion

As discussed above, pending before the Court are cross motions for summary judgment. Plaintiff is seeking that the Court dismiss Travelers' counterclaim (which, in summary, requests a declaration that Travelers is not liable to Plaintiff) and that the Court grant summary judgment in its favor finding that denial of coverage by Travelers was unjustified and in bad faith. And Travelers is seeking that the Court grant its counterclaim as a matter of law, which would consequently dispose of all of Plaintiff's claims. For ease of discussion, the Court will address Travelers' counterclaims followed by both parties' arguments with respect to coverage under the Policies.

### A.    Admiralty and Maritime Jurisdiction

Travelers' counterclaims based on the applicability of *uberrimae fidei*, the doctrine of seaworthiness and the fortuity rule, would only apply if this were a case in admiralty. Plaintiff argues that the Policies involving the LONE STAR do not invoke maritime law or admiralty jurisdiction because the LONE STAR was not a vessel; it was a "dead ship" as it was permanently removed from navigation prior to the binding of the Policies and, consequently, was not a maritime interest nor did it imply a maritime risk.

Section 1333(1) of Title 28 U.S.C. establishes that federal district courts shall have jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction." "[A]dmiralty and

maritime jurisdiction of the United States extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101 (2006). To determine whether a contract is a maritime contract, the Court does not look to whether a ship or vessel was involved in the dispute. Norfolk S. Ry. Co. v. Kirby, 543 U.S. 14, 23 (2004). The test "depends upon […] the nature and character of the contract,' and the true criterion is whether it has reference to maritime service or maritime transactions." Id. at 24 (quoting North Pacific S.S. Co. v. Hall Brothers Marine Railway & Shipbuilding Co., 249 U.S. 119, 125 (1919) (citations omitted)). The First Circuit has held that "federal admiralty jurisdiction attaches in actions based upon marine insurance policies." Acadia Ins. Co. v. McNeil, 116 F.3d 599, 601 (1st Cir. 1997). Also "hull and protection and indemnity marine insurance contracts are within the clear scope of admiralty jurisdiction." Cortes Molina v. TL Dallas (Special Risks) Ltd., 547 F. Supp. 2d 102, 109 (D.P.R. 2008).

The undisputed facts support a finding that the Policies insured a maritime interest. The Policies bound on or about September 17, 2016, and covered the period between September 17, 2016 and September 17, 2017. MER sought coverage for the LONE STAR, which was described as a vessel. On July 29, 2016, MER represented to its insurance broker and agent in dealing with Travelers, that the recycling of the vessel the LONE STAR had not yet begun. On August 11, 2016, in its Supplemental Submission, MER continued to represent to Travelers that its method of vessel demolition would "maintain […] the ship's watertight integrity, trim, and stability." Under "Insurance Requirements" MER informed that it was "seeking a marine insurance program to cover its operational risk exposures [. . .]." Under "Exposure Details" MER continued to represent to Travelers it owned four vessels, including the LONE STAR. Plaintiff thus made representations to Travelers which tend to demonstrate that it was requesting a maritime insurance policy to cover maritime risks, including for the LONE STAR. 1 THOMAS J. SCHOENBAUM, ADMIRALTY & MAR. LAW § 3:10 (6th ed. 2022) (subject matter of a maritime contract must be directly and intimately related to the operation of a vessel); see Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 540 (1995) (quoting In re The V–14813, 65 F.2d 789, 790 (5th Cir. 1933) ("[t]here are many cases holding that a dredge, or a barge with a pile driver, employed on navigable waters, is subject to maritime jurisdiction […]); In re The V-14813, 65 F.2d at 789 ("[a] barge having no means of self-propulsion but employed upon navigable waters, is a vessel subject to the admiralty jurisdiction of the United States courts.")).

Both versions of the P&I Policy provided coverage for inherently maritime risks, including seaworthiness warranty, a clause on vessel alterations or repairs, and collision liability.[2] The First Circuit Court of Appeals has held that insurance policies including maritime risks such as hull, P&I, ship repairs, and contractors' equipment are maritime contracts. See Catlin at Lloyd's v. San Juan Towing & Marine, 778 F.3d 69, 77 (1st Cir. 2015); Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc., 946 F. Supp. 2d 256, 260, 263 (D.P.R. 2013) (quoting 2 THOMAS J. SCHOENBAUM ADMIRALTY & MARITIME LAW § 19–2 (5th ed. 2012) and Acadia Ins. Co. v. McNeil, 116 F.3d 599, 603 (1st Cir.1997) (insurance policy fell under maritime law because it "insures a maritime interest (the boat) and insures primarily (if not exclusively) against risks associated with marine ventures")). Furthermore, the parties do not dispute that the P&I Policy covered voluntary and compulsory removal of the LONE STAR. And the evidence sustains that the sunken LONE STAR was deemed by the U.S. Coast Guard to represent a threat to navigation. See the USCG's Amended Administrative Order Number 007-17 at 1 ("I have determined that such a threat exists to the navigable waters of Ensenada Honda."). Maritime law applies when there is an obstruction to navigation. See Puerto Rico Ports Auth. v. Umpierre-Solares, 456 F.3d 220, 225-226 (1st Cir. 2006) (retrieval of a sunken "vessel" is maritime in nature) (quoting Cunningham v. Director, Office of Workers' Compensation Programs, 377 F.3d at 109 n. 11 (the removal of an obstruction to the 'navigation, business or commerce of the sea is maritime in nature)). As such, it is reasonable to conclude that the Policies at issue here are maritime contracts. See Puerto Rico Ports Auth. v. Umpierre-Solares, 456 F.3d at 225 ("Whether La Isla Nena was 'live' or 'dead' when it was lying at the bottom of San Juan Harbor, obstructing navigation, is of no consequence to our jurisdictional inquiry.").

   **1.    *Uberrimae Fidei***

Travelers asserts that the Policies are voidable because MER made material misrepresentations to Travelers prior to the binding of the Policies. Docket No. 120 at ¶ 7. The "federal maritime law doctrine of *uberrimae fidei* governs the relationship between the underwriter and assured in a marine insurance policy." Cortes Molina v. TL Dallas (Special Risks) Ltd., 547 F. Supp. 2d at 109 (quoting Underwriters at Lloyd's v. LaBarca, 106 F.Supp.2d 205, 209 (D.P.R.

---

[2]    Plaintiff argues that the P&I Policy issued by Travelers on July 3, 2018, does not fully conform to the agreement between the parties, and that its provisions are inherently ambiguous. Docket No. 100 at 14-15. However, the P&I Policy issued by Travelers on December 2, 2016, also contains a seaworthiness clause, alterations and repairs, and lists the LONE STAR under the schedule of vessels. Docket No. 100-9 at 32.

2000) (citations omitted)). The doctrine requires the utmost good faith between the insurer and insured. Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54 (1st Cir. 1995); QBE Seguros v. Morales-Vázquez, 2018 WL 3763305 at 5 (D.P.R.). It is such that the insured is required to make "full disclosure of all material facts of which the insured has, or ought to have, knowledge [...] even [when] no inquiry [has been] made" by the insurer. See Markel Am. Ins. Co. v. Veras, 995 F. Supp. 2d 65, 75 (D.P.R. 2014) (quoting Grande v. St. Paul Fire & Marine Ins. Co., 436 F.3d 277, 283 (1st Cir. 2006)). Indeed, even in the absence of fraud or intent to deceive, if a policy of marine insurance is issued upon false and material representations, the policy may be subject to annulment. Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc., 974 F. Supp. 2d at 78 (quoting Albany Ins. Co. v. Wisniewski, 579 F. Supp. 1004, 1015 (D.R.I. 1984)). The burden is on the insured to avoid misrepresentation or nondisclosures with respect to the interest to be insured; misrepresentations will not be excused on account of negligence, accident, or mistake. QBE Seguros, 2018 WL 3763305 at 6 (quotation and citations omitted).

Travelers argues that MER made material misrepresentations regarding the stage of demolition of the LONE STAR. It is undisputed that MER purchased the LONE STAR for the sole purpose of scrapping and recycling the vessel. MER began dismantling the LONE STAR on or about December 15, 2015. On July 29, 2016, MER represented to its insurance broker and agent in dealing with Travelers that the recycling of the LONE STAR had not yet begun and that the LONE STAR was slated for demolition. A month later, on August 11, 2016, MER described the status of the LONE STAR as "being demolished." But it was not until November 2016 that the LONE STAR was reduced to a canoe form. It is thus undisputed that MER informed Travelers, prior to the binding of the Policies, that the LONE STAR was to be demolished during the coverage period and that the LONE STAR was already being demolished. The LONE STAR's demolition concluded during the covered period. On these facts alone, the Court cannot conclude that MER violated the doctrine of *uberrimae fidei.*

Travelers further argues that MER made misrepresentations when it informed that the LONE STAR would preserve its integrity in the process of demolition and that it would be capable of being towed when no such mechanism was in place. Docket No. 120 at 13. Travelers further argues that MER failed to maintain the LONE STAR's integrity, trim, and stability when it cut the LONE STAR drastically and left it at risk of flooding and sinking. Id. at 19. During the underwriting process, Travelers was informed by MER's agent that when the LONE STAR and

other vessels were reduced to their "canoe" stage, these would remain afloat and capable of being towed. Furthermore, MER represented to Travelers that its method of vessel demolition would "maintain […] the ship's watertight integrity, trim, and stability." It is undisputed that, by October 2016, MER had substantially demolished the LONE STAR and that, by November 2016, the LONE STAR had been reduced to a "canoe" form; with only its lower hull remaining. However, whether by reducing the LONE STAR to canoe form compromised the LONE STAR's watertight integrity, trim and stability is an issue of fact not proper for disposition at summary judgement. From the record before the Court, it is not possible to ascertain whether the cause of the sinking was the state of the vessel or its demolition to canoe stage. Indeed, there is a factual dispute with respect to what might have caused the LONE STAR to sink; sabotage or criminal mischief or negligence on the part of MER. See Hutcheson's first report (stating that the cause of the loss could not be determined at that time but noting that sabotage or criminal mischief was the most probable cause (Docket No. 100-15 at 9)); Hutcheson's final report (concluding that MER failed to keep the LONE STAR in a seaworthy condition).

Travelers also alleges that MER made misrepresentations with respect to having a suitable location or method to remove the canoe of the LONE STAR from the water as MER had informed Travelers that approval by the Puerto Rico Government was a mere formality and was forthcoming. Docket No. 116-1 ¶ 34. See Docket No. 100-38 at 117:13-118:6, 122:18-123:5. And that MER did not wait for a suitable location prior to dismantling the LONE STAR. As discussed above, there is no dispute that dismantling of the LONE STAR began before the effective date of the Policies. However, Plaintiff counters that when it applied for insurance it assumed the canoe from the LONE STAR could be removed with cranes. Docket No. 118-1 ¶ 8. See Docket No. 100-3 ¶ 59; Docket No. 137-3 at 137:13-138:5. And that it was not until most of the dismantlement took place that it became evident that there were differences between the LONE STAR's documented structure and its as-built condition that did not allow for removal through cranes. Docket Nos. 141-1 ¶ 3; see also Docket No. 118-3 (Affidavit of Lawrence J. Kahn at ¶ 11). Plaintiff also sustains that MER began dismantlement despite not yet having a place to put the canoes because it relied on the promise of the Government of Puerto Rico that such a site would be provided before the actual need to remove canoes or, if the timing on such site was delayed, that "the canoes could be safely 'stored' on site […]." See Docket No. 118-3 ¶ 6. Indeed, MER did not inform Travelers that it intended to use a crane to remove the LONE STAR. It informed that, once

reduced to a canoe, the LONE STAR could be "towed to either a graving dock or dry dock, a marine railway, or a roller-slip, installed and blocked and the final cleaning and demolition […] performed." Docket No. 120-1 at ¶ 7. There is also no dispute that both MER and Travelers knew at the time that MER applied for insurance with Travelers that MER did not have formal approval for a suitable parcel of land. But whether MER knowingly misrepresented its ability to remove the canoe (by crane or towing) or its possibility of obtaining the suitable land to place the canoes pulled from the water requires factual determinations improper for summary disposition. See Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc., 974 F. Supp. 2d at 80 (disputed material facts as to whether insured complied with the *uberrimae fidei* doctrine's representation and disclosure requirements led to a denial of summary judgment); Good Bus. Corp. v. Markel Am. Ins. Co., 2012 WL 3583534 at 7 (D.P.R.) (factual disputes barred summary judgment on *uberrimae fidei*). Per the foregoing, the Court finds that there are issues of material facts preventing the summary disposition of Traveler's counterclaim seeking to void the Policies on application of the *uberrimae fidei* doctrine. Travelers' and Plaintiff's requests for summary judgment on this claim should be **DENIED**.

### 2. Seaworthiness

Travelers has moved for summary judgment on its counterclaims arguing that MER violated the express warranty of seaworthiness provided in the P&I Policy and because it failed to keep the LONE STAR in a seaworthy condition. Plaintiff argues that the LONE STAR was not a vessel as it was permanently removed from navigation, and therefore the warranty of seaworthiness does not apply.[3] Plaintiff further argues that even if the warranty of seaworthiness applied, there are genuine issues of material facts preventing summary disposition of the counterclaim because Hutcheson, Travelers' surveyor, agreed that sabotage was most likely the cause of the sinking of the LONE STAR.

"A warranty of seaworthiness is an absolute duty owed by a ship owner to its crew [and] to its insurer to provide 'a vessel and appurtenances reasonably fit for their intended use.'" Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 7 (1st Cir. 2001) (quoting Ferrara v. A. & V.

---

[3]    Plaintiff has also argued that the P&I Policy issued by Travelers on July 3, 2018, is inherently ambiguous. The P&I Policy includes a Seaworthiness Warranty. Docket Nos. 140-1 ¶ 33; 141-1 ¶ 33. See Docket No. 100-40 at 16. However, the P&I Policy issued on December 2, 2016, also included a seaworthiness warranty. Docket No. 100-9 at 10.

Fishing, Inc. 99 F. 3d 449, 453 (1st Cir. 1996)). "The duty includes maintaining the ship and her equipment in a proper operating condition, and can be breached either by transitory or by permanent defects in the equipment." Ferrara v. A. & V. Fishing, Inc. 99 F. 3d at 453. There is a presumption of unseaworthiness when a vessel sinks in calm waters. Underwriters at Lloyds v. LaBarca, 106 F. Supp. 2d at 210. The warranty of seaworthiness is implied in marine insurance policies but does not always apply. Underwriters at Lloyd's v. Labarca, 260 F.3d at 9. There is no warranty of seaworthiness for a vessel removed from navigation. Roper v. U.S., 368 U.S. 20, 24 (1961). An express warranty of seaworthiness will require an insured to maintain the vessel in a seaworthy condition or risk the voiding of the policy. Certain Underwriters at Lloyds London Subscribing to Pol'y 200-451-8464 v. Johnston, 124 F. Supp. 2d 763, 771 (D.P.R. 1999).

Plaintiff argues that the LONE STAR was not a vessel when the Policies bound and for that reason the seaworthiness warranty does not apply.[4] "The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The Supreme Court in Lozman v. City of Riviera Beach, 568 U.S. 115 (2013), held that the test to determine whether a floating structure is a vessel is whether a "reasonable observer, looking to the [structure]'s physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." Id. at 121. Simply being capable of floating, being towed, or having shore connections is insufficient to determine whether a structure is a vessel. Id. at 120. The First Circuit has expressed that a ship loses its status as a vessel when "it has no further navigation function.". Puerto Rico Ports Auth. v. Umpierre-Solares, 456 F.3d at 224 (quoting Mullane v. Chambers, 333 F.3d 322, 328 (1st Cir. 2003)).

The record before the Court does not allow it to ascertain whether the LONE STAR was a vessel capable of transporting persons or things over water, or whether it had any navigation

---

[4]    Travelers argues that Plaintiff should be precluded from relitigating that the LONE STAR was a dead ship under the doctrine of issue preclusion. In Starr Indem. & Liab. Co. v. Marine Env't Remediation Grp., LLC, 2018 WL 3611970 at 2-3 (S.D.N.Y. July 27, 2018), the District Court deemed MER's dead ship argument unavailing and denied MER's motion to dismiss for lack of subject matter jurisdiction. But the Court did not issue a final judgment on the merits of the dead ship argument. It held that it had jurisdiction over Starr's claims, which stemmed from a different insurance contract than the ones at issue here. Id. at 3. Plaintiff is not precluded from raising the defense here. See Rodríguez-García v. Miranda-Marín, 610 F.3d 756, 770 (1st Cir. 2010) (quoting Ramallo Bros. Printing, Inc. v. El Día, Inc., 490 F.3d 86 (1st Cir. 2007) ("(1) the issue sought to be precluded in the later action is the same as that involved in the earlier action; (2) the issue was actually litigated; (3) the issue was determined by a valid and binding final judgment; and (4) the determination of the issue was essential to the judgment.")).

function. The parties agree that the LONE STAR was a pipe barge. And MER purchased the LONE STAR for the sole purpose of scrapping and recycling it. An independent marine surveyor issued three reports regarding the sinking of the LONE STAR. However, Hutcheson did not make specific findings on the LONE STAR's primary function, intended use, or whether the LONE STAR's attributes allowed for it to be self-propelled over water. Plaintiff argues that Travelers admitted that the LONE STAR was permanently removed from navigation at the time the Policies bound. Docket No. 118-1 ¶ 87; Docket No. 100-38 at 315:19–316:6 ("we agree the Lone Star was removed from navigation"); Docket No. 118-2 at 38:6-11 (we believed that the "Lone Star was out of operation at the time"). However, the U.S. Supreme Court has stressed that the correct inquiry is the "objective manifestations" […] [of] "physical attributes and behavior of the structure". Lozman v. City of Riviera Beach, Fla., 568 U.S. at 128. On this record, the Court is unable to ascertain the LONE STAR's navigation function at the time the Policies bound. See Id. at 125 (quoting Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 535 (1995) (barge sometimes attached to river bottom to use as a work platform remains a "vessel" when "at other times it was used for transportation"); In re S. Recycling, L.L.C., 982 F.3d 374, 383 (5th Cir. 2020) ("[…] Southern Recycling's subjective intent to dismantle DBL 134 for scrap is insufficient to render it a dead ship"). Therefore, the Court cannot render summary judgment on whether the warranty of seaworthiness applied to the LONE STAR at the time the Policies bound.

Even assuming that the LONE STAR was a vessel, and that MER was bound to maintain it seaworthy, there are also material issues of fact as to whether MER complied with such an obligation. It is undisputed that by November 2016 the LONE STAR had been reduced to a "canoe" form. It is also undisputed that the LONE STAR sank on April 30, 2017. But there is a dispute as to the cause of the LONE STAR's sinking. While Hutcheson first concluded that the cause of the loss could not be determined and noted that sabotage or criminal mischief was the most probable cause. He later concluded that MER failed to exercise due diligence and failed to keep the LONE STAR in a seaworthy condition. A dive report on the wreck of the LONE STAR concluded that "the port main capable valve was open" and multiple pipes and valves had been cut. And there is evidence that MER employees "had been instructed not to open the sea chest valves". See Docket No. 120-1 at 373, Kahn's Dep. (Oct. 17, 2018) at 96:25-97:17 ("I acquired that knowledge from Mr. Fitzgerald, who advised that the sea chest valves were operable and that the entire staff had been instructed not to open the sea chest valves because it would allow water

into the vessel in a manner that would be difficult if not impossible to control."). Whether the opening of the sea chest valves was the cause of the sinking of the LONE STAR is disputed and whether these were opened in an act of sabotage is also contested. A jury would thus have to assess Hutcheson's credibility and expertise *vis-à-vis* Plaintiff's evidence of diligence in maintaining the LONE STAR seaworthy (and any additional evidence of sabotage) despite having reduced the LONE STAR to a canoe form. C.f. <u>Atl. Specialty Ins. Co. v. Coastal Env't Grp. Inc.</u>, 945 F.3d 53, 68 (2d Cir. 2019) (expert's testimony at trial that the barge was "in satisfactory condition for operation in inland waters" led to a finding of seaworthiness). Traveler's and Plaintiff's motions for summary adjudication of these issues should be **DENIED**.

      **3.**    **Fortuity**

      Travelers argues that it is entitled to summary judgment because the loss of the LONE STAR was not a fortuity. Plaintiff argues it has established fortuity. "An insured generally bears the burden of proving that a particular claim falls within a policy's coverage, while an insurer has the burden of proving the applicability of a particular exclusion." <u>Markel Am. Ins. Co. v. Pajam Fishing Corp.,</u> 691 F. Supp. 2d 260, 264 (D.Mass. 2010) (citation omitted). "A loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured." <u>Id</u>. at 265 (<u>quoting</u> <u>Ingersoll Milling Mach Co. v. M/V Bodena,</u> 829 F.2d 293, 307 (2d. Cir.1987)).

      Having concluded that maritime law applies to the Policies, the Court considers the rest of Plaintiff's arguments in opposition to the application of the fortuity rule: (1) that it is Travelers and not Plaintiff who must establish that the loss of the LONE STAR was not fortuitous in order to deny coverage and that the only competent evidence demonstrates that the sinking was due to sabotage, (2) there is a genuine issue of material fact as to whether MER cut the LONE STAR too far preventing a summary finding that the loss was not fortuitous, and (3) MER did not incur in willful misconduct. Docket No. 137 at 28-31.

      The burden of proof to establish coverage or lack of thereof depends on whether a policy is a named perils policy or an all-risk policy. <u>Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc.,</u> 974 F. Supp. 2d at 80-81. The parties have not briefed this issue with respect to the Policies. But this District Court has held that "[…] the insured must show that the loss or damage suffered was fortuitous" even under an all-risk policy. <u>Id.</u> at 83. This is consistent with other cases in the First Circuit. <u>See</u> <u>Perry v. Hanover Ins. Grp., Inc.,</u> 621 F. Supp. 3d 113, 120

(D.Me. 2022) (quoting Nw. Mut. Life Ins. Co. v. Linard, 498 F.2d 556, 563 (2d Cir. 1974) (citations omitted) ("the question of coverage turns on whether the event itself is fortuitous, then the matter of whether a ship's destruction was intentional goes to the scope of the policy's coverage and so properly remains the insured's burden."); Bos. Ins. Co. v. Dehydrating Process Co., 204 F.2d 441, 443 (1st Cir. 1953) ("[u]ndoubtedly the libelant as the owner of the barge and its cargo has the burden of establishing by a balance of the probabilities that its loss was caused by a risk insured against, specifically in this case by a peril of the sea, for that is the only insured risk relied upon as the cause of the loss."). As such, contrary to Plaintiff's arguments, it is Plaintiff who has the initial burden of establishing fortuity. See also Chartis Prop. Cas. Co. v. Inganamort, 953 F.3d 231, 235 (3d Cir. 2020) (in case where insurer sought a declaratory judgment that it was not liable under an all-risk policy when a vessel sank, the court held that insured was required to prove fortuity).

Plaintiff argues that the sinking of the LONE STAR was due to sabotage. Plaintiff cites to the Dive Report. See Docket No. 100-49 at 3 ("[t]his indicates that the port side main sea chest valve was open."). Plaintiff further cites to Hutcheson's first report which listed sabotage or criminal mischief as the most probable cause of the sinking of the LONE STAR. Docket No. 120-1 at 430. However, Hutcheson's final report concluded that MER failed to exercise due diligence and failed to keep the LONE STAR in a seaworthy condition from November 2016 through April 30, 2017. Docket No. 120-2 at 1; Id. at 3 ("[t]he embedded photograph illustrates a vessel which clearly not in a seaworthy state to tow, considering the lack of freeboard and the fact that the bow plating had been removed."). There is thus a clear issue of fact as to the cause of the loss and a finding of sabotage or otherwise is not possible at this stage.

Travelers argues that MER degraded the LONE STAR's stability, trim and watertight integrity rendering her incapable of being towed. See Docket No. 120-2 at 4 (Hutcheson's final report) ("[…] the height of the freeboard was only 2.5 ft. The sequence of the cutting in my professional opinion was not in keeping with prudent or sound marine practice and left the 'canoe' form of the Lone Star at risk of sinking"). See Docket No. 120-3 ¶7, Declaration of Frank Magaraci (Apr. 3, 2019) ("The freeboard at frame 4 (the distance between the waterline and the top of the bulkhead) was approximately 2.5 to 3 feet."). But there is conflicting evidence on this issue as well. For instance, it is undisputed that, in October 2016, MER believed that the LONE STAR was demolished "as far as [it] can go safely". Furthermore, Kevin Highfield, who was retained by

23

Plaintiff to provide an expert opinion regarding the sinking of the LONE STAR, found that the canoe suffered no structural failure in the sinking—it rested on the seabed intact—and although it was not suitable for going outside a safe harbor, it was afloat with stable drafts. Docket No. 137-7 ¶¶ 3.4.6 - 3.4.7. Indeed, it is undisputed that MER did not "blank off" the LONE STAR's sea chest valves. But Plaintiff has submitted evidence that MER instructed its staff not to open the LONE STAR's sea chest valves and there is a dispute as to whether MER had a duty to "blank off" or provide additional protection to the sea chest valves of the LONE STAR. Most importantly, the cause of the sinking of the LONE STAR remains unknown and cannot be attributed solely to MER's failure to blank off or provide additional protection to the sea chest valves. There are thus issues of fact as to the proximate cause of the loss of the LONE STAR and whether MER cut the LONE STAR too far or erred by failing to "blank off" the sea chest valves. See Perry v. Hanover Ins. Grp., Inc., 621 F. Supp. 3d 113, 121 (D.Me. 2022) (quoting Chartis Prop. Cas. Co. v. Inganamort, 953 F.3d 231, 235 (3d Cir. 2020) ("[s]ince the nature of a fortuitous loss is that it may not be easily explained, the insured need not point to an exact cause of the loss. Instead, [insured] need only persuade the court that it is more likely than not that the [vessel] burned for some reason other than a fire intentionally caused by [insured] or at his direction) (citations omitted)); Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., Inc., 974 F. Supp. 2d at 84 (denying summary judgment in all-risk policy when the evidence "tend[s] to support conflicting inferences" of why vessel sank).

Finally, Plaintiff argues that assuming arguendo that MER was negligent in cutting the LONE STAR too far or in failing to chain or blank off a sea chest valve, the loss of the LONE STAR would still be fortuitous because it was not a consequence of willful misconduct. Docket No. 137 at 30. The evidence tends to establish that MER knew that, if the sea chest valve was open, the vessel would be vulnerable to flooding. Docket Nos. 140-1 ¶ 57; 141-1 ¶ 57. See Ex. 1, Kahn Dep. (Sept. 12, 2022) at 177:03-178:21; see Docket 120-1 at 373, Ex. 16, Kahn Dep. (Oct. 17, 2018) at 96:25-97:17. There is also evidence that between November 2016 and January 2017, MER laid off approximately 300 of its employees, leaving only four or five employees at Roosevelt Roads. Docket Nos. 140-1 ¶ 50; 141-1 ¶ 50. See Docket No. 120-1 at 55, Kahn's Dep. (Sept. 12, 2022) at 189:06-190:12. And that in the months prior to the LONE STAR sinking, MER stopped paying its security company. Docket Nos. 140-1 ¶ 53; 141-1 ¶ 53. See Docket No. 120-1, Ex. 1, Kahn's Dep. (Sept. 2022) at 185:22-186:22. Without more, these actions are insufficient to

establish willful misconduct. See Markel Am. Ins. Co. v. Pajam Fishing Corp., 691 F. Supp. 2d 260, 265 n.4 (D. Mass.2010) (quoting Youell v. Exxon Corp., 48 F.3d 105, 110 (2d Cir.1995) (losses that arise from the insured's negligence are not excluded from coverage under the fortuity rule)). But whether these actions taken together with the fact that MER knew that it was reducing the vessel to canoe stage without having a suitable place in which to store the vessel out of the water (resulting on the vessel being left in the water for over four (4) months prior to its sinking) could be deemed willful is also an issue of fact not proper for summary disposition. Travelers' and Plaintiff's request for summary judgment with respect to whether the loss of the LONE STAR was fortuitous should be **DENIED.**

### B.    Coverage under the P&I Policy

Plaintiff argues that Travelers should be estopped from relying on policy exclusions because it breached its *uberrimae fidei* obligation to MER. Docket No. 137 at 10-11. Plaintiff cites to North American Foreign Trading Corp. v. Mitsui Sumitomo Ins. USA Inc., 499 F. Supp. 2d 361, 381 (S.D.N.Y. 2007). In Mitsui, an insurer denied two insurance claims a year after these were made. The court ultimately concluded that "[the insurer's] conduct regarding its handling of [the insured's] [second] claim amount[ed] to a breach of its duty of good faith and fair dealing and merit[ed] application of equitable estoppel to preclude its reliance on the limitations defense." Id. at 381. The court did not apply the doctrine of *uberrimae fidei* but found that the insurer breached its duty of good faith and fair dealing when it told the insured that it was investigating and waited almost a year to deny coverage. Id. at 377; 381. The Court in Mitsui held that the "[insurer] should have acted in good faith by issuing a reservation of rights letter to inform insured of [its] position [...]." Id. at 381. There is no dispute that Travelers conducted an investigation and issued three reservations of rights letter to Plaintiff prior to denying coverage. Therefore, Travelers should not be barred from defending against coverage in this case. See Narragansett Bay Ins. Co. v. Kaplan, 146 F. Supp. 3d 364, 372–73 (D.Mass. 2015) (quoting Three Sons, Inc. v. Phoenix Ins. Co., 357 Mass. 271, 257 N.E.2d 774, 777 (1970) ("A reservation of rights in such circumstances notifies the insured that the insurer's defense is subject to the later right to disclaim liability. The insured thus can take the necessary steps to protect his rights, and has no basis for claiming an estoppel.")).[5]

---

[5]       Plaintiff further cites to Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir.1986) to argue that Travelers breached a duty to *uberrimae fidei*. Docket No.141 at 2. That case discusses the duty of the assured to disclose to the insurer all circumstances material to the insurers risk. Moreover, courts have generally applied the

Travelers moves for summary judgment arguing that the costs of raising the LONE STAR were not covered under the Policies. Docket No. 120 at 8. Travelers argues that the Policies were unambiguous and that the P&I Policy was inapplicable because of a "pollution exclusion" and a "cover elsewhere clause." Id. at 9-10. In turn, Plaintiff moves for summary judgment arguing that MER was a covered insured, that the Policies are valid but ambiguous, and that Travelers is obligated to pay all costs associated with the removal of the wreck of the LONE STAR. Plaintiff further argues that Puerto Rico law is applicable as the jurisdiction with most significant contacts.[6] And that under Puerto Rico law the ambiguity in the Policies should be interpreted in favor of the insured as Travelers issued binders which contained errors and did not issue corrected policies until July 2018. Plaintiff argues that it expected to receive coverage for sue and labor; all costs associated with compulsory wreck removal and up to $1,000,000.00 of costs associated with voluntary wreck removal. Docket 100 at 21.

The issue before the Court is whether the P&I Policy covered the loss of the LONE STAR. There appears not to be a real controversy as to the fact that, after the LONE STAR sank, a pollution event was triggered— Travelers argues that the sinking of the LONE STAR was solely a pollution event and Plaintiff argues that it was primarily a compulsory or voluntary removal event with minimal pollution. There is no dispute that the P&I Policy provided coverage for both compulsory and voluntary wreck removal. The issue is whether the pollution exclusion clause found in the 2018 version of the P&I Policy applies and, if it applies, whether denial of coverage is warranted even if the loss can also be deemed a compulsory or voluntary wreck removal. The Pollution Exclusion clause provides that:

> This Policy will not indemnify the Assured against any sum(s) paid, nor insure against any liability, with respect to any loss, damage, cost, liability, expense, fine, or penalty of any kind or nature whatsoever, and whether statutory or otherwise, incurred by or imposed on the Assured, directly or indirectly, in consequence of, or with respect to, the actual or potential discharge, emission, spillage or leakage upon

---

doctrine *uberrimae fidei* to the insured not the insurer. THOMAS J. SCHOENBAUM, 2 ADMIRALTY & MAR. LAW § 19:14 (6 ed. 2022).

[6]    Travelers agrees that the interpretation of the Policies should be governed by Puerto Rico law. Docket No. 116 at 12. However, see Catlin at Lloyd's v. San Juan Towing & Marine, 778 F.3d 69, 75 (1st Cir. 2015)(refused to look to the Puerto Rico Insurance Code because marine insurance is exempted from the application of the Insurance Code); Nw. Selecta, Inc. v. Guardian Ins. Co., Inc., 541 F. Supp. 3d 206, 211 (D.P.R. 2021) (quoting Lloyd's of London v. Pagán-Sánchez, 539 F.3d 19, 25 (1st Cir. 2008) ("the Puerto Rico legislature has expressed its intent to exclude maritime insurance contracts from its statutory provisions governing the interpretation and construction of insurance contracts.")).

or into the seas, waters, land or air, of oil, petroleum productions, chemicals or other substances of any kind or nature whatsoever. Docket No. 140-1 ¶ 34; Docket No. 141-1 ¶ 34. See Docket No. 120-1, Exhibit 10 at p. 270. See Docket No. 100-9 at 29.

The P&I Policy that contains the exclusion was not issued until the year 2018—after the sinking of the LONE STAR in 2017 and after the conclusion of the coverage period in September 2017. In fact, the P&I Policy was issued after the instant litigation was filed. Plaintiff does not dispute that this is the language in the document but disputes that it was the correct version of the P&I Policy. Docket No. 141-1 ¶ 34. Indeed, on September 17, 2016, Travelers issued a P&I Binder which listed the LONE STAR on the schedule of vessels. Docket No. 100-6 at 3. The binder listed a $1,000,000 P&I limit for each vessel. It made no reference to the exclusion of a pollution event. Docket No. 100-6 at 1. And the P&I Policy issued by Travelers on December 2, 2016, which listed the LONE STAR on the schedule of vessels, did not contain a pollution exclusion for oil. Docket No. 100-9 at 32. Neither the binder nor the P&I Policy issued prior to the sinking of the LONE STAR clearly communicated that pollution coverage was excluded. Courts have held that notice of policy exclusions is essential to the insured. See Louisiana Maint. Servs.Inc. v. Certain Underwriters at Lloyds of London 616 So. 2d 1250, 1252-53 (La. 1993) ("[n]otice of any exclusionary provisions is essential because the insured will otherwise assume the desired coverage exists"; policy exclusions invalid unless "clearly communicated to the insured"); State Nat. Ins. Co. v. Settoon Towing, LLC, 2011 WL 5331696, 3-4 (E.D. La.) (denying summary judgment for insurer when policy was issued after the oil spill which did not allow insured to know exact nature of the pollution exclusion; insurer could not rely on the exclusions in its policy to deny coverage because it did not timely deliver the policy to the insured). However, on August 11, 2017, Travelers acknowledged that it had not yet provided correct written copies of the Policies that matched the intent and agreement of the parties. Docket Nos. 116-1 ¶ 67; 118-1 ¶ 67. See Docket No. 100-30 at 1, email from Zachary Cushman to Todd ("[a]s discussed, intent for coverage is outlined by the binders that are attached. We are working on getting the policies to match the agreed intent."). There are also communications prior to 2018 where coverage for pollution (or exclusion thereof) in the P&I Policy is discussed. See Docket No. 100-11 at 2, 6 (year 2017; after the loss of the LONE STAR)); Docket No. 100-41 at 1 (year 2016; before the loss of the LONE

STAR).[7] Given the conflicting evidence on this point, summary judgment on the intent of the parties with respect to the pollution exclusion is not possible.

Plaintiff argues, however, that assuming that the pollution exclusion in the 2018 policy represents the intention of the parties, the fact that Travelers agreed to provide compulsory and voluntary wreck removal coverage is sufficient to find that Travelers wrongly denied coverage and that coverage should have been provided under those clauses of the P&I Policy. In other words, that the dual nature of the claim as a pollution event and as a wreck event, renders the pollution exclusion inapplicable. There is no dispute that the P&I Policy covered compulsory and voluntary wreck removal. And there is also a solid argument that the removal of the LONE STAR was a compulsory wreck removal event as the removal of LONE STAR was ordered by both the U.S. Coast Guard and the Puerto Rico Department of Natural and Environmental Resources. But there is no evidence in the record (or in the P&I Policy at Docket No. 100-40) for the Court to conclude that the pollution exclusion was not intended to apply when the loss claimed was also a wreck removal. Furthermore, even if the parties intended for the pollution exclusion to apply only to those portions of the losses that could be attributed to pollution, the Court is in no position to assess what portion of the losses could be attributed to wreck removal.[8] These are issues best left to the jury—to ascertain (1) whether the parties intended to agree on a pollution exclusion in the first place, and (2) the scope of such an exclusion given that the parties do not dispute that the loss could be the result of both a wreck removal and pollution. For the reasons discussed above, Travelers' request for summary judgment that the loss of the LONE STAR was excluded by the application of the pollution exclusion clause in the P&I Policy should be **DENIED.** Plaintiff's request for summary judgment that the LONE STAR was covered under the compulsory or voluntary wreck removal provisions of the P&I Policy should also be **DENIED.**

Travelers has also requested that the Court find that it is entitled to summary judgment based on the general conditions of the P&I Policy which excluded double recovery. The 2018 P&I Policy contains a general condition that rejects payment by Travelers of claims otherwise paid ("General Conditions and/or Limitations": Cover elsewhere: Provided that where the Assured is,

---

[7]     From the cited emails it is not possible for the Court to conclude that the communications are evidence of intent to cover a pollution event or to exclude a pollution event in the P&I Policy.

[8]     Plaintiff admits that there is an issue of fact as to how the P&I Policy would apply in the context of a dual loss. See Docket No. 137 at p. 16.

irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance). Docket No. 100-40 at 38. However, it is undisputed that while Starr originally provided coverage under reservation of rights, it eventually moved for reimbursement by MER. And Starr's claim was settled during MER's bankruptcy proceedings, resulting in reimbursement by MER. As such, Traveler's request for summary judgment on the issue of double recovery should also be **DENIED**.

       **C.**    **Coverage under the Bumbershoot Policy**

       Plaintiff argues that the Bumbershoot Policy was triggered because, although wreck removal expenses did not exceed the underlying limits of Plaintiff's pollution policy with Starr, Starr ultimately denied coverage and sought reimbursement. Docket No. 100 at 20-21; Docket No. 137 at 17. Plaintiff further argues that the P&I Policy with limits of $1,000,000 for compulsory wreck removal was included on the schedule of underlying insurance on the Bumbershoot and therefore should have been covered under the Bumbershoot even if MER was denied coverage under the P&I Policy. Docket No. 100 at 20. It is uncontested that the Bumbershoot Policy provided coverage for compulsory wreck removal, but not voluntary wreck removal. The Bumbershoot Policy issued on July 3, 2018, provided $9,000,000.00 in excess coverage. The Bumbershoot Policy also provided excess coverage for pollution. Since there is a factual dispute as to whether the P&I Policy covered the loss of the LONE STAR, there is also a dispute as to whether the Bumbershoot Policy, an excess insurance, covered the loss of the LONE STAR. As to whether coverage was warranted under the excess of the Bumbershoot with respect to the Starr policy, Travelers contests that the limits of the Starr policy were exhausted. It is undisputed that Starr initially paid $2,485,358.97 subject to a reservation of rights and settled a claim for reimbursement for $793,500.00. The amount paid by Starr was less than the limits of the policy. Both parties' requests for summary judgment on the excess coverage of the Bumbershoot Policy should also be **DENIED**.

       **D.**    **Denial of Coverage in Bad Faith**

       "Unfair claims handling by the insurer may lead to the recovery of extra-contract damages by the insured." THOMAS J. SCHOENBAUM, 2 ADMIRALTY & MAR. LAW § 19:20 (6th ed. 2022); see Pace v. Ins. Co. of N. Am., 838 F.2d 572, 579 (1st Cir. 1988) (there is no conflict between maritime rule and action against insurer for bad faith denial of claims under state law) (quoting Steelmet,

Inc. v. Caribe Towing Corp., 779 F.2d 1485, 1490-91 (11th Cir. 1986)("state law direct actions may be brought against a marine insurer even though no provision for them exists in federal maritime law.")). Plaintiff claims relief under the Puerto Rico Civil Code, 31 P.R. Laws Ann. § 3018, for Travelers bad faith or "*dolo*" when it failed to issue correct copies of the Policies and denied coverage. Docket Nos. 100 at 26-30. Travelers counters that, after it conducted an extensive investigation, it denied coverage and that such a denial was not in bad faith. Docket No. 116 at 14-15.

Travelers provided MER with binders for the Policies on September 17, 2016. Docket Nos. 100-6; 100-7. Furthermore, there is evidence of multiple emails exchanged between Travelers and AJG discussing the terms of the Policies. Docket Nos. 100-11, 100-41. The evidence tends to establish a protracted negotiation process for the Policies. And it is certainly suspect that Travelers did not issue the Policies until after the conclusion of covered period, after the loss, and after the instant litigation was filed. But there is no concrete evidence that Travelers purposely dragged its feet to avoid issuing the Policies. Or that the delay in issuing the Policies was meant to deceive MER or to avoid compliance with its duties under the Policies. See Oriental Financial Group, Inc. v. Federal Ins. Co. Inc., 598 F.Supp.2d 199, 219 (D.P.R. 2008) (quoting Generadora De Electricidad Del Caribe, Inc. v. Foster Wheeler, 92 F.Supp.2d 8, 18 (D.P.R. 2000) ("A party acts with bad faith ('*dolo*') when it 'knowingly and intentionally, through deceitful means, avoids complying with its contractual obligation.").

There is also no dispute that Travelers investigated the sinking of the LONE STAR. MER reported the loss of the LONE STAR on May 3, 2017. The next day, on May 4, 2017, Travelers appointed Hutcheson to investigate the loss of the LONE STAR. Hutcheson first reported that sabotage could be the cause of the sinking and he changed course in his last report by faulting MER's lack of diligence and breach of the terms of the policies for the loss. On June 30, 2017, Travelers issued its first Reservation of Rights letter. On August 11, 2017, Travelers issued a second Reservation of Rights letter. On August 16, 2017, Travelers issued a Third Reservation of Rights letter. Travelers denied coverage formally on June 20, 2018. Travelers' denial of coverage was premised on the pollution exclusion in the 2018 P&I Policy, which was not included in the documents issued for the P&I Policy in 2016. However, even assuming Travelers' investigation to have been flawed, these facts alone are insufficient to establish bad faith. Pace v. Ins. Co. of N. Am., 838 F.2d 572, 584 (1st Cir. 1988) ("[a]lthough an insurer's subjective bad faith may be

inferred from a flawed investigation, an improper investigation, standing alone, is not a sufficient cause for recovery if the insurer in fact had an objectively reasonable basis to deny the claim"; "[i]f a claim is "fairly debatable," no liability in tort will arise."

A claim for *dolo* or deceit in the performance of contractual obligations under the Puerto Rico Civil Code requires that the Plaintiff establish Travelers' "conscious [and] deliberate purpose of avoiding the normal performance of the obligations" under the Policies. Marquez v. Torres Campos, 111 P.R. Dec. 854 (1982), 11 P.R. Offic. Trans. 1085 at 1098 (quotations and citations omitted). The adjudication of this claim would necessarily require an evaluation of the motivations and circumstances that led Travelers to delay the production of the corrected copies of the Policies and to deny coverage. Per the facts as discussed in the foregoing paragraphs and given that there are issues of fact as to whether the loss of the LONE STAR was ultimately excluded from coverage under the P&I Policy, summary judgment on Plaintiff's claim of bad faith under Puerto Rico law should also be **DENIED**.

## VI.    Conclusion

The parties dispute the terms of the insurance contracts, the scope of coverage under the policies (and application of exclusions), and the cause of the losses claimed by Plaintiff. Drawing all reasonable inferences in favor of the non-movant on each of their respective claims and counterclaims, this is not a case for summary disposition. For the reasons discussed above, the Court recommends that Traveler's motion *in limine* at Docket No. 117 be **DENIED**, and that both parties' requests for summary judgment also be **DENIED**.

This Report and Recommendation is filed pursuant to 28 U.S.C. §636(b)(1) and Rule 72(d) of the Local Rules of this District Court. Pursuant to Local Rule 72(d), the parties have **fourteen (14) days** to file any objections to this Report and Recommendation. Failure to file specific objections within the specified time precludes further review. See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v. Maccarone, 973 F. 2d 22, 30-31 (1ˢᵗ Cir. 1992); Maisonet v. Genett Group, Inc., 863 F.Supp.2d 138, 143 (D.P.R. 2012)(absent specific objection, no obligation to review portion of Magistrate Judge's recommendation).

**IT IS SO RECOMMENDED.**
In San Juan, Puerto Rico, this 17ᵗʰ day of July 2023.

s/Giselle López-Soler
GISELLE LÓPEZ-SOLER
United States Magistrate Judge

31