IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| Party Book Hill Park, LLC, <br><br> Plaintiff, <br><br> v. <br><br> Travelers Property Casualty Company of America <br><br> Defendant. | **Civil No. 18-01179(GMM)** |

## <u>OPINION AND ORDER</u>

This case arises from an insurance coverage dispute over the sinking of the LONE STAR, a former pipe barge owned by Marine Environmental Remediation Group, LLC (a subsidiary owned by MER Group Puerto Rico, LLC (collectively "MER")). Insurer, Traveler's Property Casualty Company of American ("Travelers" or "Defendants") denied MER coverage for the incident. On March 1, 2022, Party Book Hill Park, LLC ("Book Hill" or "Plaintiff") purchased MER's claims against Defendants after MER went bankrupt and thereafter, became the Plaintiff in this case. (Docket 49-1 at 2).

Before the Court is Magistrate Judge's Giselle López Soler's ("MJ") July 17, 2023, Report and Recommendation ("R&R"). (Docket No. 152). In her report, the MJ addressed both Plaintiff's and Travelers' motions for summary judgment regarding disputes over

Civil No. 18-01179(GMM)
Page -2-

insurance contract terms, the scope of insurance contract coverage, and the cause of Plaintiff's losses. (Docket Nos. 100, 116, 118, 120, 137, 139, 140, 141). The MJ also addressed *Travelers Property Casualty Company of America's Motion in Limine to Exclude From Use In Summary Judgment And At Trial All Evidence Offered By Book Hill Park, LLC for which it Refused to Testify in its 30(B)(6) Deposition* ("*Motion in Limine*"). (Docket Nos. 117, 119, 130, 132). For the following reasons, the Court **ADOPTS** the R&R, as amended by the alterations discussed herein.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 2016, MER entered a contract with Travelers to acquire a Protection and Indemnity Policy of Insurance ("P&I Policy") and a Bumbershoot Policy of Insurance ("Bumbershoot Policy") (collectively, "Policies") to insure the LONE STAR, a vessel it had purchased for scrapping and recycling, for the policy period of September 17, 2016 to September 17, 2017. (Docket Nos. 28 at ¶ 8; 118-1 ¶ 24; 116-1 ¶ 24; 100-40; 100-39; 100-41; 100-6; 100-7; 100-11; 100-41; 100-46 ¶ 3-4).

MER's dissemblance of the LONE STAR for recycling was performed at a former navy base, Roosevelt Roads in Ceiba (the "Facility"). (Docket No. 28 ¶¶ 36-37). By October 2016, MER reduced the barge to the "canoe" stage of recycling but was unable to complete the process because it had thus far failed to acquire a

Civil No. 18-01179(GMM)
Page -3-

parcel of land on which to store the canoes that it had detached from the vessel. Id. ¶¶ 38, 40.

On or about April 30, 2017, the LONE STAR sank at the Facility and discharged approximately 1,800 gallons of oil into the surrounding waters. (Docket Nos. 120-1 ¶ 62; 141-1 ¶ 62; 100-15 at 1; 140-1 ¶ 69; 141-1 ¶ 69; 120-1). MER stated that it immediately notified Travelers of the barge's sinking and requested coverage. Docket No. 120-1 ¶¶ 52-56. In response to MER's request for coverage, Travelers issued three reservation of rights letters on June 30, 2017, August 11, 2017, and again on August 16, 2017. Id. ¶¶ 58-60.

Following the sinking of the LONE STAR, MER's surveyors concluded that open valves on the barge caused its sinking. Id. ¶¶ 49-50. MER alleges that its agents had not opened the valves. Id. ¶ 51. After evaluating the incident, the U.S. Coast Guard issued an order demanding that the Lone STAR wreck be addressed and removed due its threat of pollution. Id. ¶ 57. Then, on July 28, 2017, the Puerto Rico Department of Natural and Environmental Resources ("DNER") issued an order directing the removal of the wreck. Id. ¶¶ 61. Subsequently, the Puerto Rico Local Redevelopment Agency ("LRA") also issued orders requiring the removal of the LONE STAR's wreckage. (Docket No. 120-1 ¶¶ 63-64).

Civil No. 18-01179(GMM)
Page -4-


Travelers was apprised of the various government agency orders. Id. at ¶¶ 60-64. Nevertheless, Travelers denied MER both compulsory and voluntary wreck removal coverage for the sinking of the LONE STAR on June 20, 2018. (Docket Nos. 20; 116-1 ¶ 75; 118-1 ¶ 75). Travelers argued that: (1) the wreck did not threaten navigation; (2) orders to remove the wreck were pollution-centric and thus excused by their Policies' pollution exclusion clauses; and (3) the wreck was a pollution event not covered by Travelers' Policies. (Docket Nos. 118-1 ¶ 94; 118-1 ¶ 98; 116-1 ¶ 98). MER retained Resolve Salvage and Fire (Americas) to raise the LONE STAR. (Docket No. 118-1 at ¶ 73).

On March 9, 2018, MER filed its initial insurance claim seeking: (1) compensation for costs associated with the compulsory wreck removal of the LONE STAR under Travelers' P&I policy; (2) remedy for Travelers' breach of contract for refusing to cover the LONE STAR's wreck removal; and (3) damages for Travelers' acting in bath faith ("dolo") pursuant to P.R. Laws Ann. Tit. 31, § 3018.

On September 14, 2018, MER filed an amended complaint against Travelers. (Docket No. 28). MER alleged that both, Traveler's P&I Policy and Bumbershoot Policy provided coverage for the LONE STAR. (Docket No. 28 ¶ 11). The P&I Policy covered compulsory and voluntary wreck removal costs up to $1,000,000, as well as damages caused by third parties, including vandalism and sabotage. Id. ¶

15. Travelers' Bumbershoot Policy covered any excess amounts after the exhaustion of other coverage that MER was required to pay for protection and indemnity risks up to a limit of $9,000,000. Id. ¶¶ 16-20. MER stated that it submitted timely payments for both policies. Id. ¶ 21.

MER also contended that Travelers issued multiple iterations of the Policies, which contained numerous errors in the contractual terms and conditions. Id. ¶¶ 22-29. Based on these contentions, MER requests that this Court grant them a declaratory judgment that Travelers is liable for all costs incurred and paid related to the LONE STAR's wreck. Id. ¶¶ 71-73. MER further seeks damages for breach of contract and dolo under Puerto Rico Law. (Docket No. 28 ¶¶ 74-89).

Travelers answered MER's amended complaint with a denial and counterclaim seeking a declaration that the P&I and Bumbershoot Policies were null and void as applied to the LONE STAR because: (1) MER breached its duty of good faith (*uberrimae fidei*); (2) MER violated the Policies' warranties of seaworthiness and it is thus not entitled to coverage; (3) the LONE STAR's sinking was not a fortuitous event and thus it is not covered by the Policies; (4) Traveler's Policies generally do not cover the barge's recovery; and (5) even if the LONE STAR is covered by the Policies, wreck

Civil No. 18-01179(GMM)
Page -6-

removal coverage under those Policies is limited by their specific terms. (Docket No. 29 at 12-14, ¶¶ 12-36).

On December 17, 2018, Travelers filed a *Motion to Stay Proceedings Pending Resolution of Case Civ No. 17-9881(LGS) in the United States District Court for the Southern District of New York* pending the conclusion of the associated case; Starr Indemnity & Liability Company v. Marine Environmental Remediation Group, LLC, Civil No. 17-9881 (S.D.N.Y). (Docket No. 32). Travelers contended that Starr Indemnity & Liability Company ("Starr") provided pollution insurance to MER that covered the LONE STAR's sinking, paid for costs of the barge's removal (costs which MER allegedly also sought to recoup from Travelers), and sued MER for reimbursement in the New York court. Id. at 3-4. Travelers argued that the outcome of MER's case with Starr directly implicated its dispute with MER. Id. The Court stayed these proceedings and administratively closed this case on February 8, 2019. (Docket Nos. 44; 46). Plaintiff then filed a motion to reopen this case on June 14, 2022, and the stay was lifted on June 16, 2022. (Docket Nos. 49; 58). Discovery for this case concluded on November 16, 2022. (Docket No. 113).

Plaintiff filed its *Motion for Summary Judgment (Partial)* on October 17, 2022. (Docket No. 100). Specifically, Plaintiff requests that the Court grant it partial summary judgment against

Civil No. 18-01179(GMM)
Page -7-

Travelers' counterclaim and find that: (1) the Court's admiralty jurisdiction and general maritime law do not apply to this case because the LONE STAR was a "dead ship"; (2) Travelers' failed to establish its *uberrimae fidei* defense; (3) the LONE STAR was not a vessel, so the warranty of seaworthiness doctrine does not apply to it; (4) the admiralty rule of fortuity does not apply to the present case; and (5) assuming arguendo that the rule of fortuity applies, then the Plaintiff submitted sufficient evidence to establish fortuity. Id. at 1-14.

Plaintiff further seeks summary judgment on its claims that: (1) the Policies' terms are ambiguous and should thus be interpreted in its favor and against the exclusions claimed by Travelers; (2) Travelers breached the terms of the P&I Policy; (3) Travelers breached the terms of the Bumbershoot Policy; and (4) Travelers denial of coverage for the LONE STAR was done in bad faith under Puerto Rico law. Id. at 11-25. Plaintiff thus argues that it is entitled to judgement as a matter of law, alleging that its only remaining dispute with Travelers is damages, which should be resolved by a jury.

Travelers then filed a *Motion in Limine* requesting that the Court exclude from evidence to be offered in summary judgment and or at trial proceedings, all evidence related to nine topics of

deposition testimony notified to Plaintiff in its Rule 30(b)(6) deposition. (Docket No. 117).

On November 30, 2022, Travelers filed its *Motion for Summary Judgment and Memorandum of Law in Support*. (Docket No. 120). Travelers requests that the Court grant summary judgment on its counterclaims, specifically finding that: (1) the costs of the LONE STAR's wreck removal were not covered under the Policies because the wreck was a pollution event excluded by the P&I Policy's pollution exclusion clause; (2) the Policies were void under the doctrine of *uberrimae fidei*; (3) MER breached the Policies' warranty of seaworthiness for the LONE STAR; and (4) the sinking of the LONE STAR was not a fortuitous event and was thus not covered by Travelers Policies. Id. at 1-21. Additionally, Travelers seeks summary judgment requesting the dismissal of Plaintiff's claims contending that Plaintiff's claim of bad faith is groundless because their coverage denial was justified given that the claimed event was not covered by the Policies. Id. at 21-24.

In December of 2022, the Court issued two orders referring motions to the MJ for Reports and Recommendations as to Travelers' and Plaintiff's summary judgment motions and Travelers' *Motion in Limine*. (Docket Nos. 133; 134). After undertaking a careful review of the record before her, the MJ issued a R&R recommending that

Civil No. 18-01179(GMM)
Page -9-

both Defendant's and Plaintiff's motions be denied. (Docket No. 152).

On July 31, 2023, Plaintiff and Defendants both filed separate objections to the MJ's R&R. (Docket Nos. 153; 154).

## II.  TRAVELERS' MOTION IN LIMINE

After Book Hill purchased MER's claim and became the primary plaintiff in the case, Travelers noticed the party deposition of Book Hill under Federal Rule of Civil Procedure Rule 30(b)(6) and attached a list of nine deposition topics. (Docket No. 117-6). Plaintiff supplied Moiz Doriwala ("Doriwala") to serve as its corporate representative. (Docket No. 117-7). During the depositions, Doriwala refused to respond to the topics notified by Travelers. Id. Doriwala stated that his knowledge of the facts of the case arose from conversations with his counsel and stated that he was excused from responding to the questions due to attorney-client privilege. Id.

Given Doriwala's alleged failure to answer any substantive questions in his deposition, Travelers' *Motion in Limine* requests that the Court preclude Plaintiff from introducing all evidence related to the nine topics of Doriwala's deposition either on summary judgement or at trial. (Docket No. 117 at 3). On November 29, 2022, Plaintiff filed an opposition statement to Traveler's *Motion in Limine* arguing that it was an untimely discovery dispute

that failed to comply with discovery rule requirements. (Docket No. 119 at 1). Critically, Plaintiff notes that Travelers supposed *Motion in Limine* sought a discovery remedy — a barring of the presentation of certain evidence — without first adhering to the Court's Order (Docket No. 114), Local Rule 26(b), or first filing a motion to compel under Federal Rule 37(a)(1). Id. at 2. As such, Plaintiff requests that the Court deny Travelers' *Motion in Limine* on procedural grounds.

In her review of the matter, the MJ acknowledged that Doriwala's invocation of attorney-client privilege to avoid answering questions at deposition was improper. Nevertheless, she agreed with Plaintiff on procedural grounds and recommended the denial of Traveler's *Motion in Limine*. The Court concurs.

Pursuant to Federal Rule of Civil Procedure 30(b)(6), when a corporation is the target of a deposition, the "named organization must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on its behalf; and. . .[t]he persons designated must testify about information known or reasonably available to the organization." Fed. R. Civ. P. 30(b)(6). Corporate parties are thus required to adequately prepare their representatives to testify on notified deposition topics, even when such preparation may be burdensome. *See* Santiago v. Costco Wholesale Corp., Civil No. 19-1082 (SCC/BJM), 2020 WL

3669642 at *1 (D.P.R. July 6, 2020); *see also* <u>In re Montreal Maine</u> <u>& Atl. Ry., Ltd.</u>, 608 B.R. 1 (Bankr. D. Me. 2019) (stating that "[t]here is no obligation to select a person with personal knowledge of the events in question, but. . .there is an implicit obligation to prepare the witness. As specified in the rule, this preparation. . .extends to all information reasonably available to the responding organization.")

At his deposition, Doriwala refused to reply to questions regarding the nine topics notified by Travelers on grounds of attorney-client privilege and a lack of knowledge independent of his communications with counsel. Thus, it is evident that Doriwala was not satisfactorily prepared to serve as Plaintiff's representative. Production of an unprepared Rule 30(b)(6) witness is treated by courts as "tantamount to a failure to appear." <u>Kyoei</u> <u>Fire & Marine Ins. Co. v. M/V Maritime Antalya</u>*,* 248 F.R.D. 126, 152 (S.D.N.Y.2007) (*quoting* <u>Bank of N.Y. v. Meridien BIAO Bank</u> <u>Tanzania Ltd.</u>*,* 171 F.R.D. 135, 151 (S.D.N.Y.1997)). As such, the MJ was correct in noting that, "Plaintiff utterly failed to comply with its obligation under Rule 30(b)(6)." (Docket No. 152 at 5).

Due to Plaintiff's shortcomings in producing a competent representative, Travelers seeks to exclude documentary and other testimonial evidence related to the nine specified topics in its Rule 30(b)(6) deposition notice to Doriwala. (Docket No. 130).

Civil No. 18-01179(GMM)
Page -12-

But, as the MJ properly finds, Traveler's request, which was made after the close of discovery is untimely and procedurally improper. Given that Travelers' objections arise out of Plaintiff's production of an incapable and uninformed corporate representative in violation of Rule 30(b)(6) requirements, their protestations here are ones of discovery, not admissibility.

A motion *in limine* is a "pretrial request that certain inadmissible evidence not be mentioned at trial." U.S. v. Agosto-Vega, 731 F.3d 62, 65 (1st Cir. 2013). Despite Doriwala's evident shortcomings as a witness, the contested testimonial evidence from his deposition is not inherently inadmissible. It would only become so if the Court were to sanction Plaintiff by barring its use at trial. Regardless, Plaintiff already notified the Court that it did not intend to present Doriwala's testimony at trial. The admissibility issue is moot. (Docket No. 132 at 5).

Rule 37(a)(1) of the Federal Rules of Civil Procedure, allows a party to enter a motion to compel disclosure or discovery. Fed. R. Civ. P. 37(a)(1). A Rule 37(a)(1) motion may be filed in instances where a corporation fails to make a designation under Rule 30(b)(6). Fed. R. Civ. P. 37(a)(3)(B)(ii). Rule 37(a)(1) provides: "[t]he motion [to compel] must include a certification that the movant has in good faith conferred or attempted to confer with the person or party failing to make disclosure or discovery

in an effort to obtain it without court action." Fed. R. Civ. P. 37(a). Local Rule 26(b) similarly requires that "[a] judge shall not consider any discovery motion that is not accompanied by a certification that the moving party has made a reasonable and good-faith effort to reach an agreement with opposing counsel on the matters set forth in the motion. An attempt to confer will not suffice." Local Civ. R. 26(b); *see also* <u>Bonner v. Triple S Mgmt. Corp.</u>, 68 F.4th 677, 686 (1st Cir. 2023); <u>Avilés v. Sol Meliá V.C. P.R. Corp.</u>, 2020 U.S. Dist. LEXIS 264495, *14 (D.P.R. 2020). As such, if the moving party fails to make such a certification, the Court is compelled to dispose of the discovery motion.

Travelers' objections to the evidence produced by Doriwala's deposition were untimely they were not submitted to the Court with the requisite Rule 37(a)(1) certification. It is undisputed that the deposition at issue was scheduled for September 26, 2022 and that discovery in the case concluded on November 16, 2022. (Docket No. 113). As such, Travelers had almost 2 months to object to Travelers insufficient production of a corporate representative. This didn't happen as Travelers did not seek a remedy for Doriwala's admittedly insufficient performance until after discovery had ended. As the MJ noted in her R&R, the Court should not impose discovery sanctions when a party made no effort to compel discovery prior to the expiration of the discovery period.

*See* Santiago v. Costco Wholesale Corp., 2020 WL 3669642 at *3 (holding that a court cannot impose sanctions when no court order compelling the information at dispute was filed).

Travelers made no attempt to seek relief within the discovery window when the Court could have compelled Plaintiff to produce a capable corporate representative. Travelers' failure to make a timely objection thus reinforced any prejudice it may have suffered at the hands of Plaintiff's provision of a poor corporate witness. Moreover, Travelers failed to engage in any reasonable and or good faith attempt to confer with Plaintiff to resolve the evidentiary dispute as is required under Rule 37(a)(1) and Local Rule 25(b). The Court, in concurrence with the MJ, finds that Travelers' *Motion in Limine* is **DENIED**.

### III. SUMMARY JUDGEMENT STANDARD

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). A "genuine issue exists where a 'reasonable jury could resolve the point in favor of the nonmoving party.'" Meuser v. Fed. Express Corp., 564 F.3d 507, 515 (1st Cir. 2009) (*quoting* Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir. 2000)). "A fact is material only if it possesses the capacity to

Civil No. 18-01179(GMM)
Page -15-

sway the outcome of the litigation under the applicable
law." <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008)
(internal quotation marks omitted).

In a summary judgement motion, the moving party bears the
burden of proving that there is a lack of material evidence
supporting the non-movant's case. *See* <u>Cellotex Corp. v. Catrett</u>,
477 U.S. 317, 325 (1986); *see also* <u>Ocasio-Hernández v. Fortuño-</u>
<u>Burset</u>, 777 F.3d 1, 4-5 (1st Cir. 2015). In considering a motion
for summary judgment, the court must consider "the record in the
light most favorable to the nonmovant' and must make all reasonable
inferences in that party's favor." <u>García-García v. Costco</u>
<u>Wholesale Corp.</u>, 878 F3d 411, 417 (1st Cir. 2017); *see also* <u>Murray</u>
<u>v. Kindred Nursing Ctrs. W. LLC</u>, 789 F.3d 20, 25 (1st Cir. 2015).

### IV.   UNCONTESTED FACTS

After examining the parties' submissions, but having
disregarded any legal arguments and conclusory statements in the
parties' statements of facts, the Court finds that the following
material facts are not in dispute:

1.   MER was the owner of the former pipe barge LONE STAR.
     (Docket Nos. 100-4 at 3; 116-1 ¶ 1; 118- 1 ¶ 1).

2.   MER purchased the LONE STAR for the sole purpose of
     scrapping and recycling it. (Docket Nos. 116-1 ¶ 2;
     118-1 ¶ 2).

3.   At all times relevant to this action, MER conducted
     its ship scrapping operation at the former navy base

at Roosevelt Roads in Ceiba (the "Facility"). (Docket Nos. 100-5 at 3; 116-1 ¶ 3; 118-1 ¶ 3).

4.   On December 15, 2015, MER leased the Facility from the LRA. (Docket Nos. 100-5; 116-1 ¶ 4; 118-1 ¶ 4).

5.   MER hired Anointed Security Services Inc. (hereinafter, "Anointed") to provide security at Pier 3, with guards on duty 24 hours a day and on the weekends. (Docket Nos. 140-1 ¶ 51; 141-1 ¶ 51).

6.   Under Annointed's corporate procedure, guards were supposed to note and to report anything out of the ordinary or unusual, including if they saw someone, heard any banging, or saw a 56 flashlight on Pier 3 or on or around MER's vessels outside of MER's normal business hours. (Docket Nos. 140-1 ¶ 52; 141-1 ¶ 52).

7.   MER began dismantling the LONE STAR on or about December 15, 2015. (Docket Nos. 140-1 ¶ 1; 141-1 ¶ 1).

8.   MER estimated that it would take approximately 6 months to reduce a vessel to its "canoe" stage. (Docket Nos. 140-1 ¶ 2; 141-1 ¶ 2; 120-1 at 1).

9.   MER hoped to use the beach at Torpedo Bay to remove the LONE STAR. (Docket Nos. 140-1 ¶ 49; 141-1 ¶ 49).

10.  Due to the LONE STAR's size, MER hoped to tow the LONE STAR out approximately 500-600 yards into the waters of Torpedo Bay, attach snatch blocks to the vessel, install a winch in the ground of Torpedo Bay Beach and winch the LONE STAR up onto the land over roller bags. (Docket Nos. 140-1 ¶; 141-1 ¶ 47).

11.  MER contracted with Travelers to enter into the P&I Policy and the Bumbershoot Policy to insure the LONE STAR barge. (Docket Nos. 100-40 (P&I Policy); 100-39 (Bumbershoot Policy); 100-41; 100-6 (P&I Policy Binder); 100-7 (Bumbershoot Policy Binder); 100-11; 100-41; 100-46 ¶ 3-4).

12. At the time MER applied for insurance with Travelers, MER knew that it did not have formal approval for a suitable parcel of land where to store canoes after removal from the water, but the Government of Puerto Rico had assured MER that one would be provided. (Docket Nos. 140-1 ¶ 28; 141-1 ¶ 28; 120-1 at 40-42).

13. On July 26, 2016, MER represented to Arthur J. Gallagher Risk Management Services, Inc. ("AJG"), MER's insurance broker and its agent in dealing with Travelers, that the recycling of the LONE STAR had not yet begun. (Docket Nos. 140-1 ¶ 4; 141-1 ¶ 4; and 120-1 at 75 ("We currently own two vessels that are slated for demolition: a) LONE STAR. . .")).

14. On July 29, 2016, AJG provided MER's Marine Insurance Submission Packet ("Initial Submission") to Travelers. (Docket Nos. 140-1 ¶ 5; 141-1 ¶ 5; 120-1 at 132).

15. MER's Initial Submission represented to Travelers that the LONE STAR was "slated for demolition" and "is to be broken up at MER facility." (Docket Nos. 116-1 ¶ 33; 118-1 ¶ 33; 120-1 at 132, 138).

16. MER's Initial Submission represented to Travelers that "[o]nce the ship has been reduced to the lower hull area (still afloat and capable of being towed), the remaining section (referred to as the 'canoe') near the conclusion of the process is towed to either a graving dock or dry dock, a marine railway, or a roller-slip, installed and blocked and the final cleaning and demolition is performed." (Docket Nos. 140-1 ¶ 7; 141-1 ¶ 7; 120-1 at 130).

17. On August 11, 2016, AJG emailed Travelers updated hull values for the SEVEN POLARIS, LONE STAR, and ATLANTIC VII, 2016-2017 Gross Receipt Forecasts/Estimates, Loss Runs, an "[i]mproved/updated Submission document" ("Supplemental Submission"), and other miscellaneous

information. (Docket Nos. 120-1 at 161; 140-1 ¶ 11;
141-1 ¶ 11).

18. In the Supplemental Submission, MER represented to
Travelers that its method of vessel demolition would
"maintain […] the ship's watertight integrity, trim,
and stability." (Docket Nos. 120-1 at 163; 140-1 ¶
15; 141-1 ¶ 15).

19. Under "Exposure Details" in the Supplemental
Submission, MER changed the LONE STAR from being
"slated for demolition" to "being demolished."
(Docket Nos. 120-1 at 165; 140-1 ¶ 14; 141-1 ¶ 14).

20. Under "Exposure Details" in the Supplemental
Submission, MER represented that it "owns four
vessels." (Docket Nos. 120-1 at 164; 140-1 ¶ 17;
141-1 ¶ 17).

21. Under "Insurance Requirements" in the Supplemental
Submission, MER represented to Travelers that "MER
is seeking a marine insurance program to cover its
operational risk exposures [. . .]" (Docket Nos.
120-1 at 164; 140-1 ¶ 16; 141-1 ¶ 16).

22. Travelers and AJG had numerous conversations about
the risk throughout the underwriting process.
(Docket Nos. 140-1 ¶ 18; 141-1 ¶ 18; 120-1 at 205-
216).

23. During the underwriting process, Travelers was
informed by AJG that when the LONE STAR and other
vessels were reduced to their "canoe" stage, these
would remain afloat and capable of being towed.
(Docket Nos. 140-1 ¶ 23; 141-1 ¶ 23; 120-1 at 130).

24. During the underwriting process, MER advised
Travelers that it expected to receive final approval
of a suitable parcel of land soon before the canoes
would need to be removed from the water. (Docket
Nos. 140-1 ¶ 20; 141-1 ¶ 20; 120-1 at 220-224).

25. During the underwriting process, Travelers was informed by AJG that the LONE STAR and other vessels would be removed from the water upon being reduced to their "canoe" stage. (Docket Nos. 140-1 ¶ 21; 141-1 ¶ 21; 120-1 at 130).

26. The Policies bound on or about September 17, 2016, and covered the period between September 17, 2016, and September 17, 2017. (Docket Nos. 140-1 ¶ 32; 141-1 ¶ 32; 116-1 ¶ 25; 118-1 ¶ 25; 100-6; 100-7).

27. MER paid all the premiums under the P&I Policy. (Docket Nos. 100-46 ¶ 6; 116-1 ¶ 26; 118-1 ¶ 26).

28. MER paid all the premiums under the Bumbershoot Policy. (Docket Nos. 100-46 ¶ 7; 116-1 ¶ 27; 118- 1 ¶ 27).

29. On September 17, 2016, Travelers issued MER a P&I Binder which established a P&I limit of liability of "$1,000,000 [for] each vessel insured" and listed the LONE STAR on the schedule of vessels. (Docket No. 100-6 at 1, 3).

30. On September 17, 2016, Travelers issued MER a Bumbershoot Coverage Binder which established a $9,000,000 limit of liability and listed the LONE STAR as possessing an underlying insurance policy for "Vessel Pollution" with a limit of $4,610,100. (Docket Nos. 100-7 at 1; 100-39 at 24).

31. The P&I Policy provided coverage for both compulsory and voluntary wreck removal. (Docket Nos. 100-6 at 1; 118-1 ¶¶ 28-29; 116-1 ¶¶ 28-29).

32. The Bumbershoot Policy provided excess coverage for compulsory wreck removal and pollution. (Docket Nos. 118-1 ¶ 100; 116-1 ¶ 100).

33. The Bumbershoot Policy did not provide coverage for voluntary wreck removal. (Docket Nos. 118-1 ¶ 32; 116-1 ¶ 32).

34.   MER demolished the LONE STAR to the point where it
      felt that it was "as far as [it] can go safely"
      sometime between September and October 2016. (Docket
      Nos. 140-1 ¶ 45; 141-1 ¶ 45; 120-1 at 43-44).

35.   After the initial declaration of reaching the
      "canoe" stage between September and October 2016,
      MER "reached the decision" to "remove a large chunk
      of the raked bow" and "then re-declared [the LONE
      STAR] to be at the canoe stage" "in or about early
      November of that year." (Docket Nos. 140-1 ¶ 46;
      141-1 ¶ 46).

36.   By November 2016, the LONE STAR had been scrapped to
      "canoe" form, i.e., only its lower hull remained.
      (Docket Nos. 116-1 ¶ 14; 118-1 ¶ 14; 100-3 ¶ 59;
      100-15 at 2).

37.   Travelers first issued a written copy of the P&I
      Policy (policy number ZOH-81M6730A-16-ND) on or
      about December 2, 2016. (Docket Nos. 100-9; 116-1 ¶
      37; 118-1 ¶ 37).

38.   The P&I Policy issued on December 2, 2016, includes
      a warranty of seaworthiness. (Docket No. 100-9 at
      10).

39.   The P&I Policy issued on December 2, 2016, includes
      a pollution exclusion clause listed under the
      "Exclusions" section of the "AIMU Protection and
      Indemnity (P and I Clauses)." (Docket Nos. 100-9 at
      29; 154 at 13-14; 157 at 5 ("Plaintiff does not
      dispute that the 2016 copy of the P&I Policy contains
      the exclusion to which Travelers cites")).

40.   The P&I Policy issued on December 3, 2016, includes
      two provisions under "General Conditions and/or
      Limitations" and "General Conditions," respectively,
      that prevent coverage for any loss or claim already
      covered by other insurance. (Docket No. 100-9 at 24,
      30).

Civil No. 18-01179(GMM)
Page -21-

41.  Travelers did not issue a written copy of the Bumbershoot Policy on December 2, 2016. (Docket Nos. 116-1 ¶ 38; and 118-1 ¶ 38).

42.  Between November 2016 and January 2017, MER laid off approximately 300 of its employees, leaving only four or five employees employed at Roosevelt Roads. (Docket Nos. 140-1 ¶ 50; 141-1 ¶ 50).

43.  In the months prior to the LONE STAR sinking, MER stopped paying its security company, Anointed, because it was engaged in a contractual dispute with Anointed. (Docket Nos. 140-1 ¶ 53; 141-1 ¶ 53).

44.  In or about February 2017, the Puerto Rican Government provided MER with a temporary location in the form of permission to use a boat ramp adjacent to MER's facility to remove the LONE STAR. (Docket Nos. 116-1 ¶ 18; 118-1 ¶ 18).

45.  As of March 13, 2017, MER owed the LRA $113,606.11 in rent for the property at Roosevelt Roads, which it had withheld due to the failure of the LRA to provide the land MER had been promised. (Docket Nos. 140-1 ¶ 61; 141-1 ¶ 61).

46.  MER did not blank off the LONE STAR's Sea chest valves. (Docket Nos. 140-1 ¶ 56; 141-1 ¶ 56; 120-1 at 340-341 ("Q. What, if anything, was done to ensure that those valves were not opened again, either intentionally or accidentally? A. [n]othing that I could think of.")).

47.  MER knew that if the sea chest valve was open, the vessel would be vulnerable to flooding. (Docket Nos. 140-1 ¶ 57; 141-1 ¶ 57).

48.  MER's hired security guards, Anointed, did not report anything unusual from the time the LONE STAR was last seen afloat on April 29, 2017, to when she was found sunk on April 30, 2017. (Docket Nos. 140-1 ¶ 63; 141-1 ¶ 63).

49.   There was no appreciable, if any, rainfall on the evening of April 29, 2017, in the vicinity of the MER facility at Ceiba, Puerto Rico. (Docket Nos. 116-1 ¶ 21; 118-1 ¶ 21).

50.   The LONE STAR sank on or about April 30, 2017. (Docket Nos. 140-1 ¶ 62; 141-1 ¶ 62; 100-15 at 1).

51.   When the LONE STAR sank, it discharged approximately 1,800 gallons of waste oil into the water. (Docket Nos. 100-18 (USCG Administrative Order); 140-1 ¶ 69; 141-1 ¶ 69).

52.   MER's insurance broker, AJG, reported the loss of the LONE STAR to Travelers on May 3, 2017. (Docket Nos. 100-13 at 1; 116-1 ¶ 24; 118-1 ¶ 24).

53.   On May 4, 2017, Travelers appointed a surveyor, Stewart Hutcheson, to investigate the loss of the LONE STAR. (Docket Nos. 100-14; 116-1 ¶ 39; 118-1 ¶ 39).

54.   On May 8, 2017, Hutcheson went to Ceiba to survey the wreck of the LONE STAR. (Docket Nos. 118-1 ¶ 40; 116-1 ¶ 40; 100-14; 100-15 at 1).

55.   On May 9, 2017, Hutcheson provided a report that stated "[t]he cause of the loss at this time cannot be determined" to the claims adjuster assigned by Travelers' to investigate the claim. (Docket Nos. Nos. 100-15 at 8; 118-1 ¶ 41; 116-1 ¶ 41).

56.   Mr. Hutcheson's first report stated that he believed "that the cause is limited to one or a combination of the following causes, with the most probable listed first. Sabotage or criminal mischief, . . . Sudden failure of hull plating on the central underside forward of amidships, . . . [and/or] Sudden failure of primary raw water supply plumbing at or around the sea chest." (Docket No. 100-15 at 9-10).

57. On June 30, 2017, Travelers issued its first Reservation of Rights letter. (Docket Nos. 100-21; 116-1 ¶ 53; 118-1 ¶ 53).

58. On July 7, 2017, the United States Coast Guard issued Administrative Order No. 007-17 ("First Administrative Order") which stated: "I have determined that there may be an imminent and substantial threat to the environment because of an actual and continued discharge of oil from the LONE STAR." (Docket No. 100-18).

59. The First Administrative Order stated that "[u]nder the Oil Pollution Act of 1990, the responsible party is liable for, among other things, removal costs and damages resulting from this condition. […] The Responsible Party, owners, operators or persons in charge of the Federal Water Pollution Control Act, to a civil penalty of up to $44,539 per day of violation or up to three (3) times the cost incurred by the Oil Spill Liability Trust Fund." (Docket No. 100-18 at 3).

60. On June 13, 2017, divers from the National Oceanic and Atmospheric Administration ("NOAA") and DNER, dove the wreck and found several coral species adjacent to the wreck which were listed as "endangered" under the Endangered Species Act. (Docket Nos. 116-1 ¶ 49; 118-1 ¶ 49).

61. On July 28, 2017, the DNER ordered that the LONE STAR be removed. (Docket Nos. 100-28; 140-1 ¶ 87; 141-1 ¶ 87).

62. The DNER's Order stated: "I order you to remove from the water within a period of no more than 30 days the sunken vessel "Lone Star" which is currently located near the pier 3." (Docket Nos. 100-28; 140-1 ¶ 88; 141-1 ¶ 88).

63. The DNER's Order did not explicitly mention "pollution." (Docket No. 100-28).

64.  On August 11, 2017, Travelers issued a Second Reservation of Rights letter. (Docket Nos. 100-29; 116-1 ¶ 63; 118-1 ¶ 63).

65.  On August 11, 2017, Travelers acknowledged that it had not yet provided correct written copies of the Policies that matched the intent and agreement of the parties. (Docket Nos. 116-1 ¶ 67; 118-1 ¶ 67; 100-30 at 1 ("As discussed, intent for coverage is outlined by the binders that are attached. We are working on getting the policies to match the agreed intent")).

66.  On August 14, 2017, the United States Coast Guard provided MER with an Amended Administrative Order Number 007-17. The Amended Order required MER to conduct a dive assessment to identify and locate any oil still present within the LONE STAR and to have resources capable of removing the threat the LONE STAR posed to the local environment. (Docket Nos. 116-1 ¶ 68; 118-1 ¶ 68; 100-31).

67.  The LRA also issued orders requiring MER remove the wreck of the LONE STAR. (Docket Nos. 116-1 ¶ 62; 118-1 ¶ 62; 100-3 ¶¶ 135, 137).

68.  On August 16, 2017, Travelers, issued a Third Reservation of Rights letter. The letter acknowledged receipt of the Amended Administrative Order 007-17 and noted that said order did not "trigger[] Travelers' P&I Policy or Bumbleshoot Policy." (Docket Nos. 116-1 ¶ 69; 118-1 ¶ 69; 100-32).

69.  On August 26, 2017, a dive team evaluated the sunken wreck of the LONE STAR and determined that the port main capable valve was open. (Docket Nos. 116-1 ¶ 102; 118-1 ¶ 102; 100-49 (Dive Report) at 3 ("[t]his indicates that the port side main sea chest valve was open. The diver also noted a large 4" line wrapped 3-4 times around the base of this valve, with a sling chocked on the valve base as well. The diver then continued to survey along the bulkhead at

Frame 20. The diver noted multiple pipes and valves along this area that have been cut.")).

70.   On August 27, 2017, Travelers confirmed that it was still investigating coverage. (Docket Nos. 116-1 ¶ 71; 118-1 ¶ 71; 100-34).

71.   On September 2, 2017, Hutcheson provided his second report to the claims adjuster for Travelers assigned to investigate the claim. (Docket Nos. 140-1 ¶ 81; 141-1 ¶ 81; 120-1 at 466-471).

72.   On September 19, 2017, MER's broker, AJG, sent Travelers a list of "correcting endorsements" to add to the P&I Policy "asap," including the "American Institute Pollution Exclusion Clause and Buyback Endorsement A." (Docket No. 100-11 at 2).

73.   MER worked with Starr, its pollution insurer, to remove the wreck of the LONE STAR. (Docket Nos. 116-1 ¶ 72; 118-1 ¶ 72; 100-35).

74.   MER began solicited quotes to remove the wreck and Resolve Salvage & Fire ("Resolve") and Ardent Global Marine Services ("Ardent") submitted bids. (Docket Nos. 116-1 ¶ 47; 118-1 ¶ 47).

75.   In or about October 2017, Resolve began its salvage efforts, and by December 6, 2017, the wreck of the LONE STAR had been completely removed. (Docket Nos. 116-1 ¶ 73; 118-1 ¶ 73; 100-36 at 1).

76.   Starr paid Resolve $2,080,000.00 to remove the LONE STAR. (Docket Nos. 140-1 ¶ 99; 141-1 ¶ 99; 120-1 at 507-510).

77.   Starr incurred and paid $2,485,358.97 in expenses on behalf of MER subject to a reservation of rights and preferred ship mortgage. (Docket No. 100-45 at 11).

78.   Starr denied MER's claim related to the sinking of the LONE STAR and demanded a full reimbursement of

the amounts paid by Starr. (Docket Nos. 100-45 ¶ 13; 118-1 ¶ 109; 116-1 ¶ 109).

79. Starr and MER reached a settlement agreement in which MER's Bankruptcy Trustee paid Starr $793,500.00 of the $1,221,000.00 being held in escrow from the sale of the SEVEN POLARIS. (Docket No. 100-45 ¶ 17).

80. On March 29, 2018, MER filed suit against Travelers in this Court, but this Court stayed proceedings on February 8, 2019, pending the outcome of litigation between MER and Starr. (Docket Nos. 116-1 ¶ 74 118-1 ¶ 74).

81. Following MER's filing of suit against Travelers, Travelers, for the first time, denied MER's claims by filing a counterclaim on June 20, 2018, in the Puerto Rico action. (Docket Nos. 20; 116-1 ¶ 75; 118-1 ¶ 75).

82. On July 3, 2018, Travelers issued the first and only copy of the Bumbershoot Policy, as well as a "corrected" copy of the P&I Policy. (Docket Nos. 116-1 ¶ 76; 118-1 ¶ 76; 100-39; 100-40).

83. The P&I Policy issued on July 3, 2018, included the LONE STAR on the P&I Policy's schedule of vessels, providing $1,000,000.00 in liability coverage. (Docket Nos. 140-1 ¶ 35; 141-1 ¶ 35; 100-40 at 32).

84. The P&I Policy issued on July 3, 2018, includes a warranty of seaworthiness. (Docket Nos. 140-1 ¶ 33; 141-1 ¶ 33; 120-1 at 255).

85. The P&I Policy issued on July 3, 2018, includes a pollution exclusion clause titled "American Institute Pollution Exclusion Clause (P&I) and Buyback Endorsement A." (Docket Nos. 140-1 ¶ 34; 141-1 ¶ 34; 100-40 at 31).

86. The P&I Policy issued on July 3, 2018, includes a provision under "General Conditions and/or Limitations" that prevents coverage for any loss or

claim already covered by other insurance. (Docket Nos. 140-1 ¶ 37; 141-1 ¶ 37; 100-40 at 38).

87. The Bumbershoot Policy issued on July 3, 2018, provided $9,000,000.00 in excess coverage (Docket Nos. 140-1 ¶ 39; 141-1 ¶ 39; 100-3 ¶ 78; 100-7, 100-39 at 1; 100-46 ¶ 16).

88. The Bumbershoot Policy issued on July 3, 2018, includes a pollution liability form. (Docket Nos. 140-1 ¶ 41; 141-1 ¶ 41; 100-39 at 26).

89. The Bumbershoot Policy issued on July 3, 2018, listed Starr's Vessel Pollution Coverage on the schedule of underlying insurances with a limit of $4,610,100.00 in coverage for the LONE STAR. (Docket Nos. 140- 1 ¶ 43; 141-1 ¶ 43; 100-39 at 24).

90. The Bumbershoot Policy issued on July 3, 2018, includes a provision under "General Conditions" excluding coverage for losses or claims covered by other valid and collectible insurance, unless the other insurance policy is in excess of the Bumbershoot Policy. (Docket Nos. 100-39 at 20; 140-1 ¶ 40; 141-1 ¶ 40).

91. Travelers denied compulsory wreck removal coverage because the wreck of the LONE STAR did not pose a threat to navigation and the orders to remove it were pollution centric. (Docket Nos. 118-1 ¶ 94; 116-1 ¶ 94; 100-38 at 17–18).

92. Travelers denied voluntary wreck removal coverage on the basis that the sinking of the LONE STAR was a pollution event. (Docket Nos. 118-1 ¶ 98; 116-1 ¶ 98; 100-38 at 26).

93. On October 19, 2022, Hutcheson provided a final report in which he claimed that "MER failed to exercise due diligence and failed to keep the LONE STAR in a seaworthy condition from November 2016 through April 30th 2017." (Docket No. 120-2 at 1).

## V. DISCUSSION

A Court may refer motions to a Magistrate Judge for review and recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Local Civ. R. 72. Within fourteen days of receiving a copy of an R&R, adversely impacted parties are entitled to "serve and file specific written objections to the proposed findings and recommendations." 28 U.S.C. § 636(b)(1)(C).

Upon receipt of a timely objection, the Court must review *de novo* "those portions of the report or specified proposed findings or recommendation to which specific objection is made." Total Petroleum Puerto Rico Corp. v. Fonseca-Marrero, Civil No. 16-2436 (PAD), 2018 WL 6131777, at *1 (D.P.R. Nov. 20, 2018) (*quoting* Ramos-Echevarria v. Pichis, Inc., 698 F.Supp.2d 262, 264 (D.P.R. 2010)); *see also* United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1986). In conducting this review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(a)(b)(1)(C).

Thus, after completing an independent review of the record, the MJ's R&R, and the Plaintiff's objections to the MJ's recommendations, the Court **ADOPTS** as amended the MJ's determinations and recommendations for resolving the issues presented at Docket Nos. 100, 117, and 120.

Civil No. 18-01179(GMM)
Page -29-

A.  <u>Admiralty and Maritime Jurisdiction</u>

Travelers' counterclaims rest on the applicability of the admiralty law doctrines of *uberrimae fidei*, seaworthiness, and fortuity. Plaintiff contends that the Policies trigger neither maritime law nor admiralty jurisdiction since the LONE STAR could not be classified as a vessel but rather was a "dead ship" that had been permanently removed from navigation prior to the Policies' binding. Dead ships, Plaintiff posits, do not fall under admiralty nor maritime jurisdiction.

Pursuant to Section 1333(1) of Title 28 U.S.C, federal district courts possess jurisdiction over "[a]ny civil case of admiralty or maritime jurisdiction. . ." 28 U.S.C. § 1333(1); *see also* U.S. Const. Art. III, § 2, cl. 1 (extending the federal judicial power to "all [c]ases of admiralty and maritime [j]urisdiction. . ."). Such jurisdiction "extends to and includes cases of injury or damage, to person or property, caused by a vessel on navigable waters, even though the injury or damage is done or consummated on land." 46 U.S.C. § 30101(a).

The test for determining whether a contract invokes admiralty or maritime jurisdiction turns on "the nature and character of the contract,' and the true criterion is whether it has reference to maritime service or maritime transactions." <u>Norfolk S. Ry. Co. v. Kirby</u>, 543 U.S. 14, 24 (2004) (*quoting* <u>North Pacific S.S. Co. v.</u>

Civil No. 18-01179(GMM)
Page -30-

Hall Brothers Marine Railway & Shipbuilding Co., 249 U.S. 119, 125 (1919)); *see also* Catlin (Syndicate 2003) at Lloyd's v. San Juan Towing & Marine Servs., 946 F. Supp. 2d 256, 259 (D.P.R. 2013) (stating that "[i]n a contract dispute, federal admiralty jurisdiction exists when the subject matter of the contract underlying a case or controversy is maritime in nature.") As such, the MJ was correct in dismissing Plaintiff's argument. (Docket No. 152 at 15). LONE STAR's alleged status as a 'dead ship' and not a vessel is immaterial to determining whether the present matter arises under maritime jurisdiction.

The First Circuit has concluded that "federal admiralty jurisdiction attaches in actions based upon marine insurance policies." Acadia Ins. Co. v. McNeil, 116 F.3d 599, 601 (1st Cir. 1997). Courts have generally recognized that federal admiralty jurisdiction is invoked in marine insurance policy disputes. See *e.g.* Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 313 (1955) ("Since the insurance policy here sued on is a maritime contract[,] the Admiralty Clause of the Constitution brings it within federal jurisdiction."); Windsor Mount Joy Mut. Ins. Co. v. Giragosian, 57 F.3d 50, 54 (1st Cir. 1995) ("The propriety of maritime jurisdiction over a suit involving a marine insurance policy is unquestionable.") This District has previously determined that disputes over the interpretation and enforcement

Civil No. 18-01179(GMM)
Page -31-

of insurance contracts accordingly fall under admiralty jurisdiction. *See* Inversiones Calmer, S.A. v. C.E. Heath & Co., 681 F. Supp. 100, 102 (D.P.R. 1988) (*citing* Ins. Co. v. Dunham, 78 U.S. 1 (1870); Wilburn Boat Co., 348 U.S. at 310).

The undisputed facts support the finding that Travelers' Policies possess a maritime interest and thus trigger admiralty and maritime jurisdiction. MER's own language throughout the Policy contracting process made it clear that it sought to procure a maritime insurance policy to cover maritime risks for its ships, including the LONE STAR. In July 2016, MER through the insurance broker AJG submitted a Marine Insurance Submission Packet to Travelers in the hope of obtaining an insurance policy to cover the LONE STAR. (Docket Nos. 140-1 ¶ 5; 141-1 ¶ 5; 120-1 at 132). During the underwriting process, MER characterized the LONE STAR as a vessel and the insurance that it was seeking as "marine." *See e.g.* Docket Nos. 120-1 at 164; 140-1 ¶ 16; 141-1 ¶ 16, stating that "MER is seeking a marine insurance program to cover its operational risk exposure" and Docket Nos. 140-1 ¶¶ 20, 21, 23; 141-1 ¶¶ 20, 21, 23 in which MER referred to "the LONE STAR and other vessels."

The maritime nature of the Policies is also evident in the contents of the Policies themselves. As the MJ highlighted, both iterations of the P&I Policy, the one issued on July 3, 2018 and

the one issued on December 2, 2016, contained innately maritime
risks including a warranty of seaworthiness, a clause on vessel
alterations or repairs, and terms on collision liability. (Docket
Nos. 100 at 14-15; 100-9 at 10, 32).  The First Circuit has held
that insurance policies covering inherently marine risks were
maritime insurance policies. *See* Catlin at Lloyd's v. San Juan
Towing & Marine, 778 F.3d 69, 77 (1st Cir. 2015) (stating that
"there can be no doubt that the Policy is an ocean marine insurance
policy. . .[because] the Policy covers maritime interests and
risks" that included "hull, P&I, ship repairs, legal, general
liability and contractors equipment."); *see also* Acadia Ins. Co.,
116 F.3d at 603 (finding that an insurance policy was governed by
maritime law because it "insures primarily (if not exclusively)
against risks associated with marine ventures.").

Finally, the parties agree that Travelers P&I Policy covered
the voluntary and compulsory wreck removal of vessels including
the LONE STAR. (Docket Nos. 100-6 at 1; 118-1 ¶¶ 28-29; 116-1 ¶¶
28-29). There is also no dispute that both the U.S. Coast Guard
and the LRA issued orders finding that the sunken LONE STAR posed
a threat to navigable waters. (Docket Nos. 100-31; 100-3 ¶¶ 135,
137). A contract falls under maritime law when a sunken ship,
regardless of its vessel status, obstructs navigation. *See* Puerto
Rico Ports Auth. v. Umpierre-Solares, 456 F.3d 220, 225-226 (1st

Cir. 2006) (finding that "whether [the ship] was 'live' or 'dead' when it was lying at the bottom of San Juan Harbor, obstructing navigation, is of no consequence to our jurisdictional inquiry. What matters is that La Isla Nena was lying at the bottom of San Juan Harbor, obstructing navigation, and that the Contract related to the removal of this obstruction."). Thus, as the MJ correctly ascertained and based upon the settled evidence, there seems to be no dispute of material fact that the Policies at issue in this case are maritime contracts falling under admiralty jurisdiction.

1.  *Uberrimae Fidei*

Travelers contends that the Policies are voidable since MER violated the maritime doctrine of *uberrimae fidei* by making material misrepresentations to Travelers prior to the Policies' binding. (Docket No. 120 ¶ 7). *Uberrimae Fidei* translates to mean "utmost good faith." Black's Law Dictionary 1754 (10th ed. 2014); *see also* Grande v. St. Paul Fire & Marine Ins. Co., 436 F.3d 277, 282 (1st Cir. 2006). Under this federal maritime doctrine, the insured in a maritime insurance contract must "disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which. . .renders the insurance contract voidable by the insurer." Windsor Mount Joy Mut. Ins. Co., 57 F.3d at 54-55; *see also* Markel Am. Ins. Co. v. Veras, 995 F. Supp. 2d 65, 75 (D.P.R. 2014) (*quoting* Grande, 436 F.3d at 283)

(stating that the insured is required to make "full disclosure of all material facts of which the insured has, or ought to have, knowledge. . .even [when] no inquiry [has been] made" by the insurer). Moreover, *uberrimae fidei* does not require a showing of fraud to be invoked to void a contract. *See* Catlin (Syndicate 2003) at Lloyd's, 974 F.Supp.2d at 73; *see also* A/S Ivarans Rederei v. P.R. Ports Auth., 617 F.2d 903, 905 (1st Cir. 1980) ("Whether the nondisclosure of a known fact material to a marine risk was intended or not is beside the point; such nondisclosure voids the policy.")

Travelers posits that MER made material misrepresentations regarding the LONE STAR's stage of demolition. Parties do not dispute MER's sole purpose in acquiring the LONE STAR was to scrap and recycle the vessel. (Docket Nos. 116-1 ¶ 2; 118-1 ¶ 2). Parties also agree that in its August 11, 2016 Supplemental Submission to Travelers, MER changed the LONE STAR's status from being "slated for demolition" to "being demolished." (Docket Nos. 120-1 at 165; 140-1 ¶ 14; 141-1 ¶ 14). It is an undisputed fact that on September 17, 2016, the Policies were binding. (Docket Nos. 140-1 ¶ 32; 141-1 ¶ 32; 116-1 ¶ 25; 118-1 ¶ 25; 100-6; 100-7). It was not until November 2016, that the LONE STAR was fully reduced to canoe form. (Docket Nos. 116-1 ¶ 14; 118-1 ¶ 14; 100-3 ¶ 59; 100-15 at 2). The facts support that Travelers was aware that demolishment of the

Civil No. 18-01179(GMM)
Page -35-

LONE STAR had already begun prior to the binding of the Policies. As such, there is insufficient evidence to demonstrate that MER violated the doctrine of *uberrimae fidei*.

Travelers also argues that MER misled it to believe that MER had secured a suitable location where it could remove and store the LONE STAR's canoes. The undisputed facts demonstrate that at the time it was applying for insurance with Travelers, MER was aware that it lacked formal government approval for a suitable parcel of land where it could store the LONE STAR canoes following their removal from the water. (Docket Nos. 140-1 ¶ 28; 141-1 ¶ 28; 120-1 at 40-42). Nevertheless, MER also represented that it received assurances from the Government of Puerto Rico that one would be provided in the future. (Docket No. 140-1 ¶ 28). The facts establish that during the underwriting process, MER advised Travelers that it did not yet have a parcel of land upon which to store the LONE STAR's removed canoes but that it expected to receive final approval from the government to establish one imminently. (Docket Nos. 140-1 ¶ 20; 141-1 ¶ 20; 120-1 at 220-224). Undisputed evidence also shows that MER chose not to wait for the acquisition of a suitable canoe storage land parcel prior to initiating its dismantling of the LONE STAR.

Travelers further argues that MER misrepresented that it had an appropriate method for removing the LONE STAR from the water.

Plaintiff stated that when MER applied for an insurance policy with Travelers, it had made the faulty assumption that the LONE STAR could be removed via crane and that it was not until later in the disassembly process that it discovered that cranes would not be a viable removal approach. (Docket Nos. 118-1 ¶ 8, 100-3 ¶ 59; 137-3 at 137:13-138:5; 141-1 ¶ 3; 118-3 (Affidavit of Lawrence J. Kahn at ¶ 11)). Notably, however, the evidence does not indicate that MER ever informed Travelers of its alleged intention to use a crane in the removal of the LONE STAR. Rather, MER stated that once the LONE STAR had been reduced to its canoe form, it could be "towed to either a graving dock or dry dock, a marine railway, or a roller-slip, installed and blocked and the final cleaning and demolition. . .performed." (Docket No. 120-1 at ¶ 7).

Finally, Travelers alleges that MER misrepresented its intentions of preserving the integrity of the LONE STAR during the demolition process and fraudulently stated that the LONE STAR would retain the capability of being towed even though no such towing mechanism was available. (Docket No. 120 at 13). Travelers contends that MER did not maintain the LONE STAR's integrity, trim, and stability when it cut the LONE STAR and left it at risk of flooding and sinking. Id. at 19.

Settled facts demonstrate that in its Supplemental Submission, MER represented to Travelers that its vessel

demolition method would "maintain. . .the ship's watertight integrity, trim, and stability." (Docket Nos. 120-1 at 163; 140-1 ¶ 15; 141-1 ¶ 15). The parties agree that during the underwriting process, AJG informed Travelers that when the LONE STAR was reduced to its "canoe" stage it would remain afloat and capable of being towed. (Docket Nos. 140-1 ¶ 23; 141-1 ¶ 23; 120-1 at 130). Parties acknowledged that by November 2016, the LONE STAR was fully reduced to a "canoe" form. (Docket Nos. 116-1 ¶ 14; 118-1 ¶ 14; 100-3 ¶ 59; 100-15 at 2). Whether the LONE STAR's canoe form compromised its integrity is an issue of fact not for this Court to determine. Moreover, a factual dispute remains open regarding the cause of the LONE STAR's sinking, be it sabotage, criminal tampering, or MER's own negligence. *See* Hutcheson's first report (stating that the cause of the loss was indeterminable but finding that sabotage or criminal mischief was the most probable cause) (Docket No. 100-15 at 9).

Given that Travelers was aware of MER's failure to yet acquire a suitable parcel of land for canoe storage at the time the Policies bound, open disputes regarding MER's ability to remove the canoe by crane or other means, and unanswered questions regarding the LONE STAR's integrity and cause of sinking, there are insufficient settled facts to grant summary judgment on the matter of whether MER complied with the doctrine of *uberrimae*

*fidei*. *See* <u>Catlin (Syndicate 2003) at Lloyd's</u>, 974 F. Supp. 2d at 80 (disputed material facts as to whether insured complied with the *uberrimae fidei* doctrine's representation and disclosure requirements led to a denial of summary judgment); <u>Good Bus. Corp. v. Markel Am. Ins. Co.</u>, Civil No. 11-1521 (SEC), 11-1532 (SEC), 2012 WL 3583534 at *7 (D.P.R. Aug. 20, 2012) (factual disputes barred summary judgment on *uberrimae fidei*).

In accordance with the foregoing arguments, the Court concurs with the MJ's conclusion that there remain issues of material facts that preclude the granting of summary judgement on Traveler's counterclaim seeking to void its Policies on grounds that MER violated the doctrine of *uberrimae fidei*. Plaintiff's and Travelers' motions for summary judgement on this claim are **DENIED**.

2.  <u>Seaworthiness</u>

Travelers filed a Motion for Summary Judgement on its counterclaims contending that (1) MER violated the express Seaworthiness Warranty in its P&I Policy and (2) MER failed to maintain the LONE STAR in a seaworthy state. Plaintiff disagrees. It argues that since the LONE STAR had been permanently removed from navigation, it was not a vessel as a matter of law and thus was not subject to the Warranty of Seaworthiness. Moreover, Plaintiff posits that even if the LONE STAR were a vessel covered by the warranty, awarding summary judgment to Travelers with

respect to the LONE STAR's seaworthiness would be inappropriate. Plaintiff stresses that a genuine dispute of material fact remained over whether MER was at fault for the LONE STAR's sinking, the fact relied on to demonstrate the barge's unseaworthiness.

"A warranty of seaworthiness is an absolute duty owed by a ship owner to its crew [and] to its insurer to provide 'a vessel and appurtenances reasonably fit for their intended use.'" Underwriters at Lloyd's v. Labarca, 260 F.3d 3, 7 (1st Cir. 2001) (quoting Ferrara v. A. & V. Fishing, Inc., 99 F. 3d 449, 453 (1st Cir. 1996)). The warranty requires shipowners to ensure that "all things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used." JJ Water Works, Inc. v. San Juan Towing & Marine Services, Inc., 59 F.Supp.3d 380, 395 (D.P.R. 2014) (quoting Gutierrez v. Waterman S.S. Corp., 373 U.S. 206, 213 (1963)). A shipowner's negligence is irrelevant to the imposition of liability, the warranty is absolute. See Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 549 (1960). All marine insurance policies possess an implied warranty of seaworthiness. See Underwriters at Lloyd's, 260 F.3d at 9. But the warranty does not apply after a vessel removed from navigation. Roper v. U.S., 368 U.S. 20, 24 (1961).

"The word 'vessel' includes every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The Supreme Court stated that the test to determine whether a floating structure is a vessel turns on whether a "reasonable observer, looking to the [structure]'s physical characteristics and activities, would consider it designed to a practical degree for carrying people or things over water." Lozman v. City of Riviera Beach, 568 U.S. 115, 121 (2013). A craft's capability of flotation, being towed, and or having shore connections does not characterize a structure as a vessel. See Id. at 120. Moreover, in determining whether a craft is a vessel, courts should "avoid subjective elements, such as owner's intent," and should consider only "objective evidence of a waterborne transportation purpose." Id. at 128.

Plaintiff contends that at the time the Policies were binding, the LONE STAR had already been removed from navigation and thus the warranty of seaworthiness did not apply to the LONE STAR at any time relevant to the present dispute. Pursuant to the dead ship doctrine, the First Circuit finds that a craft is stripped of its vessel status "when its function is so changed that it has no further navigation function." Mullane v. Chambers, 333 F.3d 322, 328 (1st Cir. 2003) (quoting Goodman v.1973 26 Foot Trojan Vessel,

Civil No. 18-01179(GMM)
Page -41-

Ark. Registration No. AR1439SN, 859 F.2d 71, 73 (8th Cir.1988)) (internal quotation marks omitted). Other Circuits have held that a structure is a "dead ship" and not a vessel when it has "been withdrawn from navigation and maritime commerce." *See e.g.* In re Southern Recycling, L.L.C., 982 F.3d 374, 383 (5th Cir. 2020); Amoco Oil v. M/V Montclair, 766 F.2d 473, 477 (11th Cir. 1986). Like the Supreme Court's Lozman test, the determination that a vessel has been withdrawn from navigation turns on the physical characteristics of and modifications to its structure. *See* In re Southern Recycling, L.L.C., 982 F.3d at 383*(citing* Thomas J. Schoenbaum, 1 Admiralty & Mar. L. § 3:6 (6th ed. 2018).

The MJ thus found that the uncontested facts in the present matter do not allow the Court to make a summary judgment determination on the LONE STAR's vessel status nor its seaworthiness. The Court agrees. Parties do not dispute that the LONE STAR had been permanently removed from navigation at the time the Policies were binding. (Docket No. 118-1 ¶ 87; 100-38 at 315:19-316:6 ("we agree the Lone Star was removed from navigation."); 118-2 at 38:6-11 ("we did believe that the Lone Star was out of operation at the time.")). However, the proper test for a craft's vessel status is a careful analysis of the "objective manifestations" of "physical attributes and behavior of the structure. . ." Lozman, 568 U.S. at 128. Notably, Traveler's

appointed surveyor, Hutcheson, made no specific findings as to the LONE STAR's fitness for navigation. Factors including the LONE STAR's dormant state and MER's purpose in purchasing the barge are not determinative. *See* Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co., 513 U.S. 527, 535 (1995) (holding that a barge that was intermittently used as a work platform was still a "vessel" since it was also occasionally "used for transportation."); In re Southern Recycling, L.L.C, 982 F.3d at 383 (noting that the "subjective intent to dismantle [a ship] for scrap is insufficient to render it a dead ship."). Based on the settled facts, the Court cannot make a finding on the LONE STAR's navigation function at the time the Policies bound and thus summary judgment on this matter is inappropriate.

Even if the Court were able to determine that the LONE STAR was a vessel at the time the Policies bound, thus requiring MER to adhere to the warranty of seaworthiness, factual disputes over whether MER met this obligation would remain. There is no argument that by November 2016 the LONE STAR had been reduced to its "canoe" form. (Docket Nos. 116-1 ¶ 14; 118-1 ¶ 14; 100-3 ¶ 59; 100-15 at 2). Parties agree that the barge sank on April 30, 2017. (Docket Nos. 140-1 ¶ 62; 141-1 ¶ 62; 100-15 at 1). But there are factual debates over the cause of the LONE STAR's sinking.

In conducting his post incident analyses of the LONE STAR's, Hutcheson first found that the likely cause of the sinking was sabotage or criminal mischief. (Docket No. 100-15 at 9-10). However, he later concluded that the LONE STAR was downed due to MER's own negligence and failure to maintain the craft in a seaworthy condition. (Docket No. 120-2 at 1). Moreover, dive reports on the LONE STAR's wreckage found that "the port main capable valve was open." (Docket Nos. 116-1 ¶ 102; 118-1 ¶ 102; 100-49 (Dive Report) at 3 ("[t]his indicates that the port side main sea chest valve was open. . .diver noted multiple pipes and valves along this area that have been cut.")). But evidence also demonstrates that MER employees "had been instructed not to open the sea chest valves." (Docket No. 120-1 at 373, Kahn's Dep. (Oct. 17, 2018) at 96:25-97:17). It thus is unclear that the open sea chest valves caused the LONE STAR's sinking and if they did, it is contested whether their open status was an act of sabotage. Further inquiry into this factual dispute is a job for a jury and is not for this Court to resolve now. Travelers' and Plaintiff's motions for summary judgment on these matters are **DENIED**.

3.   Fortuity

Civil No. 18-01179(GMM)
Page -44-

Travelers contend that the Court should grant its motion for summary judgement because the LONE STAR's loss was not the result of fortuity. Plaintiff counters that it demonstrated fortuity. "A loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured." Markel Am. Ins. Co. v. Pajam Fishing Corp., 691 F.Supp.2d 260, 264 (D. Mass. 2010); *see also* Markel Am. Ins. Co. v. Pajam Fishing Corp., 691 F.Supp.2d at 365 (*quoting* Ingersoll Milling Mach Co. v. M/V Bodena, 829 F.2d 293, 307 (2d. Cir.1987)) (stating that "[a] loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured.")

Having already concluded that the Policies are governed by maritime law, Plaintiff's contention that the fortuity rule does not apply to the LONE STAR is rendered groundless. Plaintiff, however, presents additional arguments opposing the application of the fortuity rule to the LONE STAR as discussed below.

Plaintiff posits that for the purpose of denying coverage under the Policies, Travelers bears the burden of demonstrating that the LONE STAR's sinking was not fortuitous. As an initial matter, the applicable burden of proof to determine coverage for an allegedly fortuitous incident turns on whether a policy is a named perils policy or an all-risk policy. Catlin (Syndicate 2003) at Lloyd's, 974 F.Supp.2d at 80-81. Parties have not briefed this

matter but "to prove that an all-risks insurance policy covers its claim, the insured has the burden of demonstrating the existence of an all-risk policy, an insurable interest in the subject matter of the insurance contract, and the fortuitous loss of the covered property." § 49:28. Marine insurance, 16 Williston on Contracts § 49:28 (4th ed.).

"The burden of demonstrating fortuity is not a particularly onerous one." Morrison Grain Co. v. Utica Mut. Ins. Co., 632 F.2d 424, 430 (5th Cir. 1980). "Since the nature of a fortuitous loss is that it may not be easily explained, the insured need not point to an exact cause of the loss." Chartis Property Casualty Company v. Inganamort, 953 F.3d 231, 235 (3d Cir. 2020). This District has previously held that the insured bears the burden of proving that a particular "loss or damage suffered was fortuitous" even under an all-risk policy. Caitlin (Syndicate 2003) at Lloyd's, 974 F.Supp.2d at 83. Other courts have concurred. See e.g. Perry v. Hanover Ins. Grp., Inc., 621 F.Supp.3d 113, 120 (D.Me. 2022) (quoting Nw. Mut. Life Ins. Co. v. Linard, 498 F.2d 556, 563 (2d Cir. 1974)) ("the question of coverage turns on whether the event itself is fortuitous, then the matter of whether a ship's destruction was intentional goes to the scope of the policy's coverage and so properly remains the insured's burden."); Chartis Property Casualty Company, 953 F.3d at 235 ("The First, Second,

Fifth, and Eleventh Circuits have all held that, for marine insurance policies, the insured bears the burden of proving that the loss was fortuitous.") Accordingly, contrary to Plaintiff's arguments, it is Plaintiff and not Travelers who bears the burden of demonstrating fortuity.

Plaintiff further argues that the LONE STAR's loss was the result of third-party sabotage. Sabotage by a third party is fortuitous. *See* Ferrara & DiMercurio, Inc. v. St. Paul Mercury Ins. Co., 169 F.3d 43 (1st Cir. 1999) (noting that "Even if fortuity were a requirement for fire coverage, arson by a third party, however intentional on the part of the arsonist, surely is 'fortuitous' vis-a-vis the insured, who does not expect that such a loss will occur.") Plaintiff further notes that the Dive Report found that the barge's main sea chest valve was open. (Docket No. 100-49 at 3). Moreover, Plaintiff references the initial report of Traveler's surveyor stating that he believed "that the cause [of the LONE STAR's sinking] is limited to one or a combination of the following causes, with the most probable listed first. Sabotage or criminal mischief. . ." (Docket No. 100-15 at 9-10). However, Hutcheson's final report determined that the cause of the sinking was MER's failure to maintain the LONE STAR in a seaworthy condition. (Docket No. 120-2 at 1). These contradictory reports

Civil No. 18-01179(GMM)
Page -47-

underscore that a clear issue of fact regarding whether the LONE
STAR's loss was the result of sabotage remains.

Travelers alleges that MER rendered the LONE STAR incapable
of being towed and vulnerable to sinking by degrading its
stability, trim and watertight integrity. (Docket No. 120-2 at 4
(Hutcheson's final report) ("the height of the freeboard was only
2.5 ft. The sequence of the cutting in my professional opinion was
not in keeping with prudent or sound marine practice and left the
'canoe' form of the Lone Star at risk of sinking.")). Plaintiff
however argues that there is a genuine dispute of material fact as
to whether MER cut the LONE STAR too far preventing a summary
judgement finding that the loss was not fortuitous.

Parties agree that between September and October 2016, MER
believed that the LONE STAR had deem disassembled "as far as [it]
can go safely." (Docket Nos. 140-1 ¶ 45; 141-1 ¶ 45; 120-1 at 43-
44). Moreover, an expert retained by Plaintiff, Kevin Highfield,
determined that the LONE STAR's canoe demonstrated no structural
failure in its sinking and that, although it was unsuitable for
transport outside of safe harbor, it was afloat with stable drafts.
(Docket No. 137-7 ¶¶ 3.4.6-3.4.7). Furthermore, although it is
undisputed that MER did not "blank off" the LONE STAR's sea chest,
a dispute remains over whether MER had a duty to "blank off" or
provide the sea chest valves with additional protection.

Critically, it is unknown whether MER's failure to "blank off" or provide the sea chest valves with additional protection caused the barge's sinking. As such, questions regarding whether: (1) MER's actions proximately caused the loss of the LONE STAR; and (2) whether MER cut the barge too far or erred in not "blanking off" its sea chest valves remain undeterminable. Thus, as concluded by the MJ, granting summary judgment at this juncture would be inappropriate. *See* Catlin (Syndicate 2003) at Lloyd's, 974 F.Supp.2d at 84 (denying summary judgment in all-risk policy when the evidence "tend[s] to support conflicting inferences" of why vessel sank).

Finally, Plaintiff suggests arguendo that even if MER was negligent in cutting the LONE STAR too far or in failing to "blank off" or chain the sea chest valves, the barge's loss should still be classified as a fortuitous because MER did not engage in willful misconduct. (Docket No. 137 at 28-31). Losses resulting from negligent behavior can be considered fortuitous. *See* Goodman v. Fireman's Fund Ins. Co., 600 F.2d 1040, 1042 (4th Cir. 1979) ("A loss is not considered fortuitous if it results. . .from ordinary wear and tear. . .However, loss due to the negligence of the insured or his agents has generally been held to be fortuitous and, absent express exclusion, is covered by an all risks policy."); Youell v. Exxon Corp., 48 F.3d 105, 110 (2d Cir. 1995)

("The fortuity rule excludes from coverage losses that arise from. . .wear and tear. . .; losses that arise from. . .the insured's negligence[ ] are covered."), *vacated on other grounds by* <u>Exxon Corp. v. Youell</u>, 516 U.S. 801 (1995).

It is undisputed that between November 2016 and January 2017, MER fired approximately 300 of its employees, leaving only four or five employees employed at Roosevelt Roads. (Docket Nos. 140-1 ¶ 50; 141-1 ¶ 50). Furthermore, Parties acknowledge that in the months preceding the LONE STAR's loss MER stopped making payments to its security company. (Docket Nos. 140-1 ¶ 53; 141-1 ¶ 53). These facts on their own are insufficient to support a determinative finding that MER engaged in willful misconduct. As such, Plaintiff's, and Traveler's requests for summary judgement on the matter of whether the LONE STAR's sinking was fortuitous are **DENIED.**

B.   <u>Coverage under the P&I Policy</u>

Travelers moves for summary judgment arguing that its Policies are clear and plainly do not cover the costs of removing the LONE STAR's wreck. (Docket No. 120 at 8). Specifically, Travelers contends that: (1) the P&I Policy contained clear "pollution exclusion" and "cover elsewhere" clauses; (2) the LONE STAR's sinking was a pollution event and the raising of the ship was ordered for the purpose of abating and preventing oil

Civil No. 18-01179(GMM)
Page -50-

discharge; and (3) Starr provided MER with pollution coverage and paid for the response and clean-up of the LONE STAR. Id. at 5-6.

While Plaintiff acknowledges that the sinking of the LONE STAR certainly qualified as a "pollution event," it disagrees that the pollution that occurred relieved Travelers of its contractual obligations to cover all costs associated with the barge's wreck removal. (Docket No. 100 at 19). Plaintiff alleges that the Policies' terms were ambiguous. Plaintiff further contends, and Travelers agrees, that the Policies should be governed under Puerto Rico law. (Docket Nos. 100 at 12-16; 116 at 12).[1] Pursuant to Puerto Rico law, Plaintiff argues that ambiguous insurance policies are to be interpreted in favor of the insured and as such they are entitled to coverage under the P&I Policy's voluntary and compulsory wreck removal terms as a matter of law. (Docket No. 137 at 10). On these grounds, Plaintiff argues that the Court should grant it summary judgment.

Parties do not dispute that the P&I Policy covered the LONE STAR for both compulsory and voluntary wreck removal. (Docket Nos. 100-6 at 1; 118-1 ¶¶ 28-29; 116-1 ¶¶ 28-29). Moreover, it is agreed

---

[1] Past cases, however, have not applied Puerto Rico law in resolving maritime insurance disputes. See, e.g. Catlin at Lloyd's, 778 F.3d at 75 (refused to look to the Puerto Rico Insurance Code because marine insurance is exempted from the application of the Insurance Code); Nw. Selecta, Inc., 541 F.Supp.3d at 211(quoting Lloyd's of London v. Pagán-Sánchez, 539 F.3d 19, 25 (1st Cir. 2008)) ("the Puerto Rico legislature has expressed its intent to exclude maritime insurance contracts from its statutory provisions governing the interpretation and construction of insurance contracts.").

Civil No. 18-01179(GMM)
Page -51-


that the LONE STAR's sinking caused a pollution event that
discharged 1,800 gallons of waste oil into navigable waters.
(Docket Nos. 100-18 (USCG Administrative Order); 140-1 ¶ 69; 141-
1 ¶ 69). The issues in controversy regarding the applicability of
the P&I Policy are: (1) whether under the Policies the LONE STAR's
sinking was purely a pollution event, as characterized by
Travelers, or if it was predominately a compulsory or voluntary
wreck removal incident that produced pollution; and (2) whether
the Policy's pollution exclusion clause functions to eliminate
coverage of the LONE STAR's loss.

Plaintiff contends that Travelers should be fully barred from
relying on its Policy exclusions, specifically, the pollution
exclusion clause, to deny coverage due to Travelers' alleged breach
of the duty of *uberrimae fidei*. (Docket No. 137 at 10-11).
Plaintiff stresses that "Travelers cannot, in fairness, be
permitted to benefit from its own misconduct in failing to issue
proper copies of the Policies until after the LONE STAR was raised
and after MER was forced to sue Travelers for coverage and in
failing to investigate and adjust the loss." Id.

Insurer's obligations of *uberrimae fidei* are not well-
developed in admiralty law. Thus, Plaintiff's argument draws upon
a 2007 case arising from an insurer's breach of the duty of good
faith and fair dealing. *See* North American Foreign Trading Corp.

v. Mitsui Sumitomo Ins. USA Inc., 499 F.Supp.2d 361, 381 (S.D.N.Y.
2007). In Mitsui, an insurer denied two insurance claims almost a
year after they were made. The court there did focus on the duty
of *uberrimae fidei* but rather determined that the insurer's
decision to wait almost a year to deny coverage constituted a
breach of its duty of good faith and fair dealing. Id. at 377,
381. The Court there stressed that the "[insurer] should have acted
in good faith by issuing a reservation of rights letter to inform
insured of [its] position. . ." Id. at 381.

In the present matter, and unlike the insurer in Mitsui, there
is no question that Travelers investigated and issued three
reservations of rights letters to Plaintiff prior to denying
coverage under the Policies. (Docket Nos. 100-21; 100-29; 100-32).
As such, the Court, like the MJ, is not persuaded that Travelers
should be estopped from defending against coverage of the LONE
STAR. *See* Narragansett Bay Ins. Co. v. Kaplan, 146 F.Supp.3d 364,
372-73 (D.Mass. 2015) (*quoting* Three Sons, Inc. v. Phoenix Ins.
Co., 357 Mass. 271, 257 N.E.2d 774, 777 (1970)) ("A reservation of
rights in such circumstances notifies the insured that the
insurer's defense is subject to the later right to disclaim
liability. The insured thus can take the necessary steps to protect
his rights and has no basis for claiming an estoppel.")

Consequently, having determined that dispute of the Policies is not barred under the doctrine of *uberrimae fidei*, the Court next considers whether the Parties clearly intended to include an enforceable pollution exclusion clause in the Policies. As an initial matter, the Court respectfully disagrees with the MJ's determination that it was unclear that the Parties intended to include the pollution exclusion clause in the P&I Policy. The MJ's initial analysis on the applicability of the pollution exclusion clause to the LONE STAR rested on her determination that the clause only appeared in the edited July 2018 iteration of the P&I contract which was not issued until after the barge's sinking and the conclusion of the Policy's coverage period. (Docket No. 152 at 27). However, in reviewing the relevant documents, the Court found that the original P&I Policy issued on December 2, 2016 contained a nearly identical pollution exclusion clause. Specifically, the 2016 version of the Policy provides that:

> Notwithstanding anything to the contrary elsewhere herein the Underwriters will not indemnify the Assured in respect of the following matters: [. . .] (N) Any liability for, or any loss, damage, cost, expense, fine, or penalty of any kind or nature whatsoever, whether statutory or otherwise, incurred by or imposed on the Assured, directly of indirectly, in consequence of, or with respect to, the actual or potential discharge, emission, spillage or leakage upon or into the seas, waters, land or air, of substances of any kind or nature whatsoever.

Civil No. 18-01179(GMM)
Page -54-

Docket No. 100-9 at 28-29. The July 2018 version of the Policy

provides that:

> This Policy will not indemnify the Assured against any sum(s)
> paid, nor insure against any liability, with respect to any
> loss, damage, cost, liability, expense, fine, or penalty of
> any kind or nature whatsoever, and whether statutory or
> otherwise, incurred by or imposed on the Assured, directly or
> indirectly, in consequence of, or with respect to, the actual
> or potential discharge, emission, spillage or leakage upon or
> into the seas, waters, land or air, of oil, petroleum
> productions, chemicals or other substances of any kind or
> nature whatsoever.

(Docket No. 100-40 at 31; 140-1 ¶ 34; 141-1 ¶ 34).

In consideration of these undisputed facts, the Court finds

that there is not an open question as to whether the pollution

exclusion clause was present in both the 2016 and 2018 versions of

the P&I Policy.

Nevertheless, Plaintiff argues that the pollution exclusion

clause in neither iteration of the P&I Policy should apply to the

LONE STAR because both versions of Policy do not match the Parties'

true intent and agreement. (Docket No. 157 at 6). However, the

plain language of both versions of the P&I Policy is sufficient to

render the clause's applicability unambiguous. *See* Littlefield v.

Acadia Ins. Co., 392 F.3d 1 (1st Cir. 2004); *see also* 2 Lee R.

Russ, Couch on Insurance § 22:43 (3d ed. 1995) ("Since it must be

assumed that each word contained in an insurance policy is intended

to serve a purpose, every term will be given effect if that can be

done by any reasonable construction."). There exists no version of the P&I Policy presented in the present matter that does not include a pollution exclusion clause, and thus, no intrinsic evidence of Plaintiff's intent to exclude the provision is to be considered.[2]

Plaintiff posits that even assuming that the pollution exclusion clause is applicable to the LONE STAR, it does not function to relieve Travelers of the obligation to provide compulsory and voluntary wreck removal in accordance with the P&I Policy. Put simply, Plaintiff argues that the LONE STAR's sinking, discharging of oil, and subsequent raising was <u>both</u> a pollution event <u>and</u> a wreck event. Plaintiff further argues that the P&I Policy is ambiguous given that Travelers admittedly failed to issue correct written copies of the Policies until July 2018 after the LONE STAR had sunk and these proceedings had begun. As such, Plaintiff finds the P&I Policy to be inherently ambiguous because the final terms, the scope of those terms, and how those terms interacted with one another was not reduced into writing until two years after the Lone Star incident occurred. Plaintiff contends

---

[2] Even if this Court were to consider extrinsic evidence of intent, the record contradicts Plaintiff's narrative. The P&I Binder issued on September 17, 2016, explicitly lists "AIMU Protection and Indemnity Clauses," a boilerplate provision which includes pollution in its list of exclusions. (Docket Nos. 100-6 at 1; 100-9 at 26, 29). Moreover, on September 30, 2016, MER's broker and agent, AJG, asked Travelers to add the "American Institute Pollution Exclusion Clause and Buy Back Endorsement A" to the list of endorsements included on the P&I binder, clearly indicating MER's intent to include a pollution exclusion.

that under applicable Puerto Rico Law, when the terms of an insurance contract are ambiguous, the matter should be resolved in favor of the insured. Plaintiff cites this Court's previous finding that if an insurance policy is ambiguous "it will generally be construed against the insurer who drafted it in order to promote coverage for losses to which the policy relates. . . " Nw. Selecta, Inc. v. Guardian Ins. Co., Inc., 541 F.Supp.3d 206, 211–12 (D.P.R. 2021) (quoting Ingersoll Mill. Mach. Co., 829 F.2d at 306). Thus, in light of the Policy's ambiguity and controlling Puerto Rican law, Plaintiff asks the Court to grant it summary judgment on the Policy's coverage of the LONE STAR.

As previously noted, the parties agree that the P&I Policy covered compulsory and voluntary wreck removal. (Docket Nos. 100-6 at 1; 118-1 ¶¶ 28–29; 116-1 ¶¶ 28–29). As the MJ acknowledges, there is a sound argument that the LONE STAR's raising constituted a compulsory wreck removal given that the U.S. Coast Guard, the Puerto Rico Department of Natural and Environmental Resources, and the Local Redevelopment Authority for Roosevelt Roads all issued orders requiring the raising and removal of the sunken barge. (Docket Nos. 100-18; 100-28; 116-1 ¶ 62; 118-1 ¶ 62; 100-3 ¶¶ 135, 137). Moreover, as the MJ noted, there is insufficient evidence in the record that would allow the Court to determine whether the pollution exclusion clause applies in instances in which the loss

claimed is also a wreck removal. (Docket No. 152 at 28). Additionally, based on the presented evidence, the Court cannot determine for the purposes of summary judgement whether damages from an event like the LONE STAR's sinking —that is dual in nature— are severable into pollution damages and wreck removal damages. Assuming that such damages are severable, the Court recognizes that it is ill-suited to assess, categorize, and divide damages across liable parties.[3]

Considering the foregoing, the Court finds that a jury is best suited to determine the scope and effect of the pollution exclusion clause in the context of a dual pollution and wreck event such as that of the LONE STAR. For the reasons reviewed above, Travelers' request for summary judgment that coverage of the LONE STAR was wholly excluded under the P&I Policy's pollution exclusion clause is **DENIED.** Plaintiff's request for summary judgment that the LONE STAR was covered by the compulsory or voluntary wreck removal provisions of the P&I Policy regardless of the applicability of the pollution exclusion clause is also **DENIED.**

Finally, Travelers moved this Court to grant it summary judgment based on the "cover elsewhere" clause in the general conditions of the P&I Policy. The 2018 Policy contains the

---

[3] Plaintiff acknowledges that there is an issue of fact as to how to apply the P&I Policy in the context of a dual loss. (Docket No. 137 at 16).

condition that, "Provided that where the Assured is, irrespective of this insurance, covered or protected against any loss or claim which would otherwise have been paid by the Assurer, under this policy, there shall be no contribution by the Assurer on the basis of double insurance." (Docket No. 100-40 at 38). But, as the MJ correctly noted, it is undisputed that although Starr originally provided pollution coverage under reservation of rights for the LONE STAR incident, it ultimately moved for and received reimbursement from MER during MER's bankruptcy proceedings. (Docket Nos. 100-45 at 11; 100-45 ¶ 17). Thus, Traveler's request for summary judgment on the issue of double recovery is **DENIED**.

C.   <u>Coverage under the Bumbershoot Policy</u>

Plaintiff argues that Travelers also breached the Bumbershoot Policy. (Docket 100 at 20). As such, in determining the appropriate damages owed by Travelers for the sinking of the LONE STAR, Plaintiff contends that the jury should be allowed to consider the Bumbershoot Policy's coverage limits. <u>Id.</u> Plaintiff contends that although the LONE STAR's pollution removal did not exceed the limits of its Starr Policy, because Starr ultimately denied coverage and sought reimbursement for its cost payments for the LONE STAR incident, the Bumbershoot Policy was triggered by the LONE STAR's pollution event. (Docket Nos. 100 at 20-21; 137 at 17). Travelers disagrees arguing that the coverage of the LONE

STAR's pollution event by Starr was not exhausted and thus, the Bumbershoot Policy was not triggered to provide excess pollution coverage. There is no disagreement that Starr initially paid $2,485,358.97 subject to reservation of rights and later settled a claim for reimbursement for $793,500. (Docket No. 100-45 ¶ 17). As such, the amount paid by Starr fell under its policy limits.

Plaintiff also argues that considering that the costs of the LONE STAR's raising exceeded $1,000,000 the Court should find that Travelers breached the Bumbershoot policy by failing to pay the excess expenses associated with the barge's compulsory wreck removal. (Docket No. 100 at 20). It is uncontested that the Bumbershoot Policy provides excess coverage for both compulsory wreck removal and pollution. (Docket Nos. 118-1 ¶ 100, 116-1 ¶ 100). Parties also agree that the LONE STAR was scheduled on the Bumbershoot Policy. (Docket Nos. 100-7 at 1, 100-39 at 24).

The MJ held that in light of the open factual dispute regarding the LONE STAR's coverage under the P&I Policy's compulsory wreck removal provision, summary judgment on the applicability of the excess insurance Bumbershoot Policy would be inappropriate at this time. (Docket 152 at 29). The Court agrees and thus holds that both Plaintiff's and Defendant's demands for summary judgment as to the excess coverage of the Bumbershoot Policy are to be **DENIED**.

D.    Denial of Coverage in Bad Faith

     Plaintiff alleges that Travelers violated Puerto Rico Civil
Code, 31 P.R. Laws Ann. § 3018 by acting in bad faith or "dolo"
when it failed to issue correct copies of its Policies and denied
Plaintiff's coverage for the LONE STAR's sinking. (Docket Nos. 100
at 26-30). Plaintiff requests that the Court grant it summary
judgment, finding that Travelers acted bad faith. Travelers
disputes Plaintiff's dolo claims arguing that it did not act in
bad faith and that its denial of coverage under the Policies was
the valid result of a careful investigation of the facts before
it. (Docket No. 116 at 14-15).

     "Under Puerto Rico law, 'dolo,' or contractual fraud, occurs
when the wrongful representations or omissions affect the freedom
of consent of one of the contracting parties." Portugues-Santana
v. Rekomdiv Int'l, 657 F.3d 56 (1st Cir. 2011). "A party acts with
bad faith ('dolo') when it 'knowingly and intentionally, through
deceitful means, avoids complying with its contractual
obligation.'" Oriental Financial Group, Inc. v. Federal Ins. Co.
Inc., 598 F.Supp.2d 199, 219 (D.P.R. 2008) (quoting Generadora De
Electricidad Del Caribe, Inc. v. Foster Wheeler, 92 F.Supp.2d 8,
18 (D.P.R. 2000)). A claim for dolo under the Puerto Rico Civil
Code requires that claimant establish "conscious [and] deliberate
purpose of avoiding the normal performance of the obligations"

under the Policies. Marquez v. Torres Campos, 111 D.P.R. 854, 11

P.R. Offic. Trans. 1085, 1098 (1982) (*quoting* 8-1

Manresa, Comentarios al Código Civil Español 209 (6th ed. 1967)

(Ed. Reus Madrid)).

It is undisputed that Travelers provided MER with Policy

binders on September 17, 2016. (Docket Nos. 100-6; 100-7).

Moreover, the parties agree that on August 11, 2017, Travelers

acknowledged that it had not yet provided MER with written copies

of the Policies that matched the intent and agreement of the

parties. (Docket Nos. 116-1 ¶ 67; 118-1 ¶ 67; 100-30 at 1).

Evidence further demonstrates that Travelers and AJG exchanged a

series of subsequent emails discussing the terms of the Policies.

(Docket Nos. 100-11, 100-41). For example, in a September 19, 2017

email, AJG sent Travelers a list of "correcting endorsements" to

be added to the P&I Policy "asap." (Docket No. 100-11 at 2).

The MJ concluded that these facts suggested that negotiation

of the Policies was a protracted process and that it was suspect

that Travelers failed to issue the final Policies until after the

conclusion of the coverage period, the loss of the LONE STAR, and

the initiation of these proceedings. Nevertheless, the MJ did not

identify any determinative evidence suggesting that Travelers was

intentionally slow or deceptive in its dealings with MER, nor did

she find concrete proof that Travelers purposefully attempted to

avoid complying with its obligations under the Policies. This Court also found no such evidence and thus concurs with her determinations.

The following undisputed facts substantiate that there can be no disagreement that Travelers performed an investigation of the sinking of the LONE STAR. On May 3, 2017 MER reported the loss of the barge to Travelers. (Docket Nos. 100-13 at 1; 116-1 ¶ 24; 118-1 ¶ 24). Travelers then appointed Stewart Hutcheson to investigate the barge's sinking. (Docket Nos. 100-14; 116-1 ¶ 39; and 118-1 ¶ 39). Hutcheson issued three reports of his analysis. (Docket Nos. 100-15; 120-1; 120-2). His final report concluded that the LONE STAR's loss was caused by MER's own negligence. (Docket No. 120-2 at 1). As such, Travelers issued three Reservation of Rights letters on June 30, 2017, August 11, 2017, and August 16, 2017. (Docket Nos. 100-21; 100-29; 100-32). Then on June 20, 2018, Travelers entered its formal denial of coverage based on the pollution exclusion clause in the 2018 version of the P&I Policy. (Docket Nos. 20; 116-1 ¶ 75; 118-1 ¶ 75). Moreover, even if Travelers investigation of the LONE STAR's loss was faulty, those shortcomings are insufficient to substantiate a dolo claim. *See* Pace v. Ins. Co. of N. Am., 838 F.2d 572, 584 (1st Cir. 1988) ("Although an insurer's subjective bad faith may be inferred from a flawed investigation, an improper investigation, standing alone,

is not a sufficient cause for recovery if the insurer in fact had an objectively reasonable basis to deny the claim"; "[i]f a claim is "fairly debatable," no liability in tort will arise).

As was previously stated, to substantiate a claim of dolo, Plaintiff must demonstrate that Travelers acted with deliberate purpose and intent to avoid its contractual obligations under the Policies. *See* Marquez, 111 D.P.R. 854, 11 P.R. Offic. Trans. 1085. Investigations of intent are not for the Court to decide. *See* Gazelle v. MR 314 Fortaleza LLC, Civil No. 16-2500 (GAG), 2019 WL 13193718 at *3(D.P.R. Mar. 14, 2019) ("[T]here are unsettled issues of motive and intent as to the conduct of the parties, which precludes the court from granting summary judgment."); Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 677 (1st Cir. 1996) (reversing summary judgment and emphasizing that "determinations of motive and intent. . .are questions better suited for the jury"); Tew v. Chase Manhattan Bank, N.A., 728 F.Supp. 1551, 1555 (S.D. Fla. 1990) ("*Certain issues such as fraud, intent, and knowledge lend themselves to trial, rather than summary judgment. These matters can often only be proved by reliance upon circumstantial evidence except in the rare case where there is uncontroverted proof of a 'smoking gun.'*") (emphasis supplied). Drawing on the facts above, the MJ and the Court both find that

Civil No. 18-01179(GMM)
Page -64-

summary judgment on Plaintiff's claim of dolo under Puerto Rico law must be **DENIED**.

## V. CONCLUSION

For the reasons stated above, the Court **ADOPTS** the MJ's Report and Recommendation as amended. Thus, Travelers' Motion *in Limine* at Docket No. 117 is **DENIED**; Travelers' Motion for Summary Judgement at Docket No. 120 is **DENIED**; and Plaintiff's Motion for Summary Judgement at Docket No. 100 is **DENIED**.

IT IS SO ORDERED.

In San Juan, Puerto Rico, September 19, 2023.


<u>s/Gina R. Méndez-Miró</u>
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE